### Kathleen REYNOLDS, Plaintiff Below, Appellant,

v.

### Phillip J. REYNOLDS, Defendant Below, Appellee.

Supreme Court of Delaware.

Dec. 28, 1967.

Gerald Z. Berkowitz, of Wahl, Greenstein & Berkowitz, Wilmington, for plaintiff below, appellant.

WOLCOTT, Chief Justice, and CAREY and HERRMANN, JJ., sitting.

HERRMANN, Justice.

In this action for divorce brought on the ground of extreme cruelty,* the Superior Court denied a decree, holding that the plaintiff wife had failed to sustain her burden of proof by a preponderance of the evidence in "view of the lack of corroborative evidence and the direct conflict in the testimony of the parties." The plaintiff appealed; the defendant husband did not appear in the appellate proceedings, although he did contest the divorce action below.

At the trial, the plaintiff testified substantially as follows: There were two main instances of physical abuse. On the first occasion in 1962, while intoxicated in their home, the defendant struck the plaintiff, beat her with a pocketbook, pushed her down on a couch, and knocked her down the steps. On that occasion, he repeatedly threatened to kill her. The plaintiff fled the home, stayed the night at a hotel, and the next day took an apartment. She returned for her clothes under the protection of police officers because of her fear of her husband. After several days of continued threats upon her life, the plaintiff left for Ohio where she had relatives; she stayed there for about six months.

After repeated importunings by the defendant, the plaintiff consented to return to him upon his promises to reform. Soon

---

* 13 Del.C. § 1522(4) provides:

  "§ 1522. Grounds for divorce from the bonds of matrimony

  "The causes for divorce from the bonds of matrimony shall be—

  \*       \*       \*       \*       \*

  "(4) Extreme cruelty, on the part of either husband or wife, such as to endanger the life or health of the other party or to render cohabitation unsafe;"

Under this Statute, it has been held that "\* \* \* extreme cruelty may consist of any physical act or acts which impair the health of the injured party or renders cohabitation between the parties unsafe \* \* \*." Jackson v. Jackson, Del., 4 Storey 271, 178 A.2d 455 (1962).

thereafter, however, the defendant returned to heavy drinking and violent action and threats toward the plaintiff, as the result of which she was frequently obliged to leave the home. The plaintiff continued to live with the defendant until December 1966. As the result of repeated threats to kill her, the plaintiff finally left and moved into a trailer. Shortly thereafter, following telephone threats to kill her, the defendant, waving a large claw-hammer, broke into the trailer, after smashing windows and breaking the door, shouting meanwhile that he was going to kill the plaintiff. She called the police, but before they had time to arrive, the defendant wrecked much of the contents of the trailer, seized the plaintiff, pushed her against the wall, beat her head and "banged" her against the wall, twisted her arms, and repeated his threats to kill her. The plaintiff was able to avoid hammer blows only by struggling. A neighbor, Mrs. DuRoss, was present during this incident. The plaintiff fled the trailer and had the defendant arrested for assault and battery.

The plaintiff testified repeatedly that by reason of the violent conduct of her husband over a long period of time, she feared for her life and was unable to live with him in safety.

Mrs. DuRoss, the neighbor who witnessed the trailer incident testified that she was visiting the plaintiff when the defendant arrived at the trailer; that the defendant brandished the claw-hammer and shouted threats to kill the plaintiff. Mrs. DuRoss stated that she saw the defendant smash the furniture and furnishings of the trailer, heard the repeated threats, and witnessed the following:

"Q What was happening? What did you see?

"A He was shoving her over towards the room divider, up against it. He was holding this hammer. He was threatening her with it as she was backing up trying to get away.

"Q Did you see her trying to get away the whole time he was threatening her?

"A Yes.

"Q Did she in fact get away?

"A Finally she got away when he pulled the telephone out of the wall. That's when she got away from him and went out the back door.

"Q What did he do at that point?

"A Then he went after her.

"Q Did he look to her as though he was threatening to hit her on the head with the hammer?

"A Yes. That's what I thought he was going to do.

"Q Do you think if she had not defended herself he would in fact have hit her in the head?

"A I think he would have if I hadn't been there because he had murder in his eyes."

Mrs. DuRoss also testified that the defendant returned to the trailer after the plaintiff had fled therefrom, and did further damage. Immediately after the struggle, Mrs. DuRoss noticed bruises on the plaintiff's arms and the plaintiff told her that they were inflicted by the defendant during the fracas.

Further evidence was given by Mrs. Weber, a friend of the plaintiff, who testified as follows:

"I * * * was getting in my car when I heard the phone ring. I went racing back into the house and it was Kitty. She was completely hysterical. I asked her what was the matter.

"Q What do you mean by hysterical?

"A She couldn't even talk. She said, 'Jane, are you coming?' I said, 'Yes. What's the matter?' She said, 'Phil

broke into my trailer and tried to kill me.' I said, 'Where are you now?'

" 'I'm over at Helen's.'

"Q   Helen who?

"A   Oh, dear, I don't even know her name. The girl who was just here. She said, 'I'm there.' I said, 'What are you going to do?' She said, 'I don't know.'

"I said, 'Are you going to stay there?' She said, 'I'm not going to stay here. He'll kill me.' So she said, 'I'm going down and swear out a warrant for his arrest.' I said, 'You want me to go with you?' She said, 'I'll be glad if you do.'

\*     \*     \*     \*     \*     \*

"Q   Did you leave immediately then from the trailer after that?

"A   Yes.

"Q   Where did you take her?

"A   She went to my house.

"Q   How long did she stay at your house?

"A   She was with me for three days and three nights.

"Q   Did you have occasion to see any marks on her body or anything that had been recently placed there?

"A   I am sure I did. She had a big bang on the back of her head. Her arms were bruised and her back was bruised.

"Q   Would you describe those marks to the Court, what they looked like. For instance, the one on the back of her head.

"A   It was a knot.

"Q   You didn't see him do that?

"A   No. I asked her what happened. She said he banged her against the wall and she had fingermarks on her arms.

"Q   Did she have any bruises on her arm from being struck on the arm?

"A   She had a shirt and slacks. It was quite cold that night. She had a shirt and slacks. It wasn't until we were going to bed that she put her nightie on that I saw the bruises on her arm."

Countering the foregoing testimony of the plaintiff and the corroborating witnesses, there was only the disavowal of the defendant that he had ever struck or threatened his wife at any time during their marriage; that he loved her very much, and that he wanted her to return to him.

With the evidence in that posture, the Superior Court denied the petition for divorce on the ground that the plaintiff had failed to sustain her burden of proof by a preponderance of the evidence.

We have reviewed the facts and the law in this case. Nelson v. Murray, Del., 211 A.2d 842 (1965). It is our opinion that the testimony of Mrs. DuRoss and Mrs. Weber constituted sufficient corroborative evidence to tip the scales heavily in the plaintiff's favor, assuming that the testimony of the parties was, as the Trial Judge found, in equipoise. Compare Lecates v. Lecates, Del.Super., 8 W.W.Harr. 190, 190 A. 294 (1937). We are unable to agree, therefore, with the conclusion of the Trial Judge that the plaintiff failed to sustain her burden of proving extreme cruelty by a preponderance of the evidence. The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists. We are satisfied that by far the greater weight of the evidence in this case clearly rests on the plaintiff's side of the scale.

There is, of course, a limit to the amount of corroboration an abused wife can adduce. Wife-abusers do not usually operate before witnesses. Moreover, the requirement of corroborative evidence is less stringent in a contested divorce case than in an uncontested case. Since collusion is less probable in a contested case, less corroboration is necessary. See Annotation, 15 A.L.R.2d 170, et seq.; 3 Nelson,

Divorce and Annulment, (2d Ed.) § 26.13; Senderoff v. Senderoff, 133 Conn. 300, 50 A.2d 422 (1946); McLaughlin v. McLaughlin, 244 S.C. 265, 136 S.E.2d 537 (1964).

In a close case, we would not disturb the Trial Court's conclusions as to the weight of the evidence. Compare Anton v. Anton, 10 Terry 431, 118 A.2d 605 (1955); Lacombe v. Lacombe, 78 R.I. 118, 79 A.2d 760 (1951); Glendening v. Glendening (D.C.App.) 206 A.2d 824 (1965). Nor would we ordinarily substitute our judgment for that of the Trial Judge as to the credibility of witnesses whom he saw and heard. Nardo v. Nardo, Del., 209 A.2d 905 (1965). But the Trial Judge did not state that he disbelieved the corroborating witnesses; rather, he stated that there was a "lack of corroborative evidence."

In view of the testimony hereinabove set out, we think that the conclusion of the Trial Court was clearly wrong, and that justice requires a ruling that the plaintiff has sustained her burden of proving extreme cruelty by a preponderance of the evidence. Compare Lank v. Steiner, Del., 224 A.2d 242 (1966).

Accordingly, the judgment below must be reversed with directions to issue a decree nisi.