**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| D.W. BURT CONCRETE CONSTRUCTION, INC. | : : : : | |
| Plaintiff, | : : | |
| v. | : : : | |
| DEWEY BEACH ENTERPRISES, INC., LIGHTHOUSE COVE DEWEY BEACH LAND UNIT C LLC, LIGHTHOUSE COVE DEWEY BEACH LAND UNIT F LLC, LIGHTHOUSE COVE DEWEY BEACH LAND UNIT H LLC, LIGHTHOUSE COVE DEWEY BEACH LAND UNIT L LLC, AND DAYSTAR SILLS, INC. | : : : : : : : : : : : | C.A. No.: S13L-10-043 RFS |

Defendants.

## MEMORANDUM OPINION

*Decision after Bench Trial.  Verdict for Plaintiff.*

Submitted:  November 24, 2015
Decided:  February 17, 2016

Robert V. Witsil, Esquire, Robert V.Witsil, Jr. P.A., Georgetown, Delaware, Attorney for the Plaintiff.

Victoria Petrone, Esquire, Logan & Petrone, LLC, New Castle, Delaware, Attorney for the Defendants.

**J. STOKES**

## I. INTRODUCTION

This is the Court's decision following a bench trial on a breach of contract action and a statement of claim for a mechanics' lien. Plaintiff D.W. Burt Concrete Construction, Inc. ("Burt") filed a Complaint against Defendants Dewey Beach Enterprises, Inc., Lighthouse Cove Dewey Beach Land Unit C LLC, Lighthouse Cove Dewey Beach Land Unit F LLC, Lighthouse Cove Dewey Beach Land Unit H LLC, Lighthouse Cove Dewey Beach Land Unit L LLC, and Daystar Sills, Inc. (collectively "Daystar") seeking $568,621.00 in satisfaction of a mechanics' lien. After consideration of the facts in evidence and the applicable law, the Court finds that Burt properly pleaded its mechanics' lien claim and proved the commencement date. Further, the Court finds that Daystar grossly overstated the amount in dispute when it discharged the lien, and Daystar is not entitled to any set-offs of the contract balance.

## II. FACTS AND PROCEDURAL POSTURE

Daystar is a real estate development firm owned by David Sills ("Sills"). Burt is a concrete construction company owned by Daniel Burt ("Daniel").[1] In September 2012, Daystar, as the general contractor, retained Burt, as a subcontractor, to provide concrete installation and other services for the construction of the Hyatt Hotel (the "Project") in Dewey Beach, Delaware. The contract (the "Agreement") called for work to begin on September 12, 2012. Although the contract expressed that time was of the essence, it did not provide a specific date by which the work was to be completed.

In consideration for the work performed, Daystar agreed to pay Burt a total of $2,300,000.00 pursuant to a payment schedule set forth in the Agreement. Under the terms of the Agreement, Burt was required to submit a written requisition for payment on or before the twenty-fifth day of each month showing the proportionate value of the work performed through

---

[1] This Opinion refers to Daniel Burt as "Daniel" to distinguish the person from the company.

the end of the month. Daystar would then pay Burt ninety percent of the value of the work performed by Burt on the twentieth day of the following month. Daystar would keep the remaining ten percent as retainage.[2] Once Burt completed fifty percent of the Project, the amount of retainage would be reduced to five percent.

Burt began construction on September 17, 2012. At trial, Daystar submitted a schedule that indicated Burt's portion of the Project was to be completed by January 28, 2013. This date was not met.[3] The relationship between Daystar and Burt began to strain because both parties believed that the other was not satisfying the terms of the Agreement. Specifically, Daystar alleged that Burt was not performing in a timely manner, and Burt alleged that Daystar failed to make payments in accordance with the Agreement.

As a means to mitigate the delay in Burt's performance, Daystar sought to exercise its rights under the Agreement by doing whatever was necessary to maintain the work schedule.[4] At trial, Daystar submitted an itemized list of expenses it incurred by exercising this contractual right.[5] Namely, Daystar incurred expenses on behalf of Burt for the following: (1) constructing footings; (2) replacing a broken sanitary sewer pipe; (3) labor for removing shoring; (4) grinding of cast in place walls; (5) finishing of the stair tower and pool area walls; (6) finishing the underside of balconies; (7) correcting improper elevation on slabs; (8) redesigning the out-of-plumb stair; and (9) supervising. In total, Daystar alleges it incurred $116,960.35 to remedy Burt's alleged delay in performance.

On August 6, 2013, Burt completed its portion of the Project and submitted a payment requisition form for $224,935.00—the balance of the contract price withheld as retainage. After

---

[2] Retainage is a percentage withheld by the general contractor until the work is satisfactorily completed.
[3] In fact, Burt did not complete its portion of the Project until August 2013. Both parties testified that, due to changes, the schedule submitted at trial was not indicative of the actual schedule.
[4] *See* Daystar's Trial Exhibit (hereinafter "DTX"), Tab 1 at Article IV.
[5] *Id.* at Tab 3.

Daystar refused to pay, Burt initiated a mechanics' lien on the Project. Because the mechanics' lien prevented Daystar from selling any part of the Project with clear title, Daystar sought a lien discharge pursuant to 25 *Del. C.* § 2729.

Burt filed a Complaint for breach of contract and a statement of claim for a mechanics' lien against Daystar on October 24, 2013, seeking the balance of the contract price as well as $343,696.00 for "change orders."[6] In response, Daystar filed an Answer denying Burt's claims and asserting a counterclaim seeking damages for breach of contract as well as legal expenses.[7]

On October 29, 2014, Daystar filed a motion for partial summary judgment of Burt's claims for change orders. This Court granted Daystar's motion for summary judgment. As a result, Burt was precluded from seeking $343,696.00 in change orders at trial.

Following a bench trial held on June 1, 2015, the Court reserved decision pending post-trial briefing.

### III. THE PARTIES' CONTENTIONS

### A. Burt's Contentions

Burt argues that it substantially performed its contract with Daystar and is entitled to the contract balance of $224,935.00 plus interest. Also, Burt contends that Daystar grossly overstated the amount of the disputed claim when it posted bond to discharge the mechanics' lien.[8] Burt further contends that Daystar's gross overstatement was done in bad faith and, as a result, this Court should grant double damages pursuant to 25 *Del. C.* § 2729(a).

---

[6] Am. Compl. ¶ 16. A change order is work that is added to or delete from the original scope of work of a contract that alters the original contract amount.
[7] Answ. and Countercl. ¶ 64.
[8] Burt's Post Trial Br. at 13.

## B. Daystar's Contentions

Daystar argues that Burt incorrectly established the date construction commenced in its statement of claim for a mechanics' lien and, therefore, failed to meet the statutory requirements of 25 *Del. C.* § 2712(b). As a result of Burt's failure to establish the date at trial, Daystar contends judgment should be entered in its favor. Additionally, Daystar argues that they are entitled to recover damages as an offset according to the Agreement and if Burt is entitled to any recovery, that recovery should be limited to $89,229.81. Lastly, Daystar asserts that it is entitled to legal fees pursuant to a provision in the Agreement.

## IV. STANDARD OF REVIEW

In a bench trial, the Court is the finder of fact and the parties must prove the elements of each claim by a preponderance of the evidence.[9] Thus, the Court shall find in favor of the party upon whose side the greater weight of the evidence is found.[10]

## V. DISCUSSION

## A. The Mechanics' Lien

Daystar argues that Burt failed to properly plead and prove its mechanics' lien because the date of commencement was not established. Specifically, Daystar contends "Burt did not include its Amended Statement of Claim and Complaint for Mechanic's Lien . . . as a trial exhibit and Burt cannot simply rely upon its initial pleading because if that were permitted, there would be no need for a trial in the mechanic's lien case at all."[11] After a review of the record, the Court finds that although Burt failed to introduce the Complaint as a trial exhibit, Burt met its burden of proving the mechanics' lien at trial. Furthermore, even if Burt failed to meet its

---

[9] *Patel v. Patel*, 2009 WL 427977, at *3 (Del. Super. Feb. 20, 2009) (citing *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967)).

[10] *Id.*

[11] Daystar's Post Trial Br. at 7.

burden of proof, "[i]n a non-jury case, the court may, upon request, reopen the record after trial if so doing will serve the interests of fairness and substantial justice."[12] Had Burt's failure to introduce the Complaint been fatal, as Daystar contends, it would be within the discretion of this Court to allow Burt to supplement the record to cure this error.

"The mechanics' lien statutes are to be strictly construed because they are in derogation of the common law; however, they are 'not to be construed in such a fashion as to produce an unreasonable or unwarranted construction.' "[13] 25 *Del. C.* § 2712 reads, in pertinent part:

(a) Every person entitled to the benefits conferred by this chapter and desiring to avail himself or herself of the lien provided for this chapter, shall . . . file a statement of claim, which may also serve as a complaint . . .

(b) The complaint and/or statement of claim shall set forth:

(5) The time when the doing of the labor or the furnishing of the materials was commenced;

(6) The time when the doing of the labor or furnishing of the materials was finished;

. . . .[14]

The averment of the dates required by the mechanics' lien statute is essential to the existence of the lien.[15] In *Middle States Drywall v. DMS Properties-First, Inc.*, the defendants argued that the plaintiff failed to properly plead its mechanics' lien. The plaintiff's complaint established August 10, 1994, as the date construction commenced. However, the plaintiff's records indicated that construction commenced on August 16, 1994. The Court found that the

---

[12] David L. Finger & Louis L. Finger, *Delaware Trial Handbook* § 8:4 (2010) (emphasis added); *see also Carlson v. Hallinan*, 925 A.2d 506, 519-20 (Del. Ch. 2006) (noting that, in a bench trial, it is within the court's discretion to allow a party to supplement the record before judgment).

[13] *Constr. Res. Mgmt. v. Littleton*, 2008 WL 4117186, at *3 (Del. Super. Aug. 28, 2008) (quoting *Kershaw Excavating Co., Inc. v. City Sys., Inc.*, 1989 WL 124434, at *1 (Del. Super. Oct. 6, 1989) *rev'd on other grounds*, 581 A.2d 1111 (Del. 1990)).

[14] 25 *Del. C.* § 2712

[15] *Middle States Drywall v. DMS Properties-First, Inc.*, 1996 WL 453418, at *14 (Del. Super. May 28, 1996) (citing *Poole v. Oak Lane Manor*, 118 A.2d 925, 926 (Del. Super. 1955) *aff'd* 124 A.2d 725 (Del. 1956)).

plaintiff's errors in this regard were not fatal to its mechanics' lien claim.[16] In its reasoning, the Court likened the necessity of giving dates of commencement and completion to the necessity of pleading certain matters with particularity under Superior Court Civil Procedure Rule 9. That is, certain averments must be made as a matter of fairness to the opposing party. If the averments are proven untrue at trial, it will not have the effect of rendering a complaint deficient. Furthermore, "this Court has recognized that the mechanics' lien statute requires these dates for two specific purposes: 1) the commencement date determines the priority of competing liens, and 2) the completion date determines if the lien was filed within the required time period."[17]

Burt's Complaint states that the start date was September 12, 2012, and the end date was August 9, 2013. There is no dispute as to the date construction was completed, and the Court need not address that matter. As Daystar correctly pointed out in its post-trial brief, Burt testified that construction actually began on September 17, 2012.[18] Thus, the Complaint incorrectly identifies the start date as September 12, 2012. However, the Court is not convinced that Burt's error, with respect to the commencement date, is fatal to its mechanics' lien.[19] The purpose of the mechanics' lien statutory requirements was fulfilled: the priority of competing liens is not affected by the five-day discrepancy discovered at trial. The Court finds that the dates provided by Burt in the Complaint, though erroneous, fulfill the requirements of 25 *Del. C.* § 2712 and, therefore, the commencement date was sufficiently proven at trial.

---

[16] *Id.* at *15.

[17] *Joseph Rizzo & Sons v. Christina Momentum, L.P.*, 1992 WL 51850, at *3 (Del. Super. Feb. 21, 1992).

[18] *D.W. Burt Concrete Constr. Co. v. Dewey Beach Enter., Inc.*, at 27:14-15 (Del. Super. June 1, 2015) (TRANSCRIPT) (hereinafter "Transcript").

[19] *See Ewing v. Bice*, 2001 WL 880120, at *3 (Del. Super. July 25, 2001) (holding that incorrect dates of commencement and completion will not result in a complaint being dismissed for lack of compliance with 25 *Del. C.* § 2712).

7

## B. Discharging the Mechanics' Lien

Burt argues that Daystar grossly overstated the disputed amount when it posted the bond to discharge the mechanics' lien. Delaware law allows property owners to discharge a mechanics' lien by depositing the disputed amount with the Court.[20] To petition the Court for discharge, the property owner must also submit an affidavit "setting forth which parts of the claim filed hereunder are disputed and which parts are not disputed."[21] The non-disputed portion of the claim must be paid to the claimant before the lien is discharged.[22] If the Court determines that the affiant has grossly overstated the disputed amount of the claim or acted in bad faith,[23] "the Court may, in its discretion, award damages to the claimant against the affiant in an amount up to twice the figure stated by the affiant to be disputed."[24]

In Delaware, as elsewhere, the law of bad faith is not a doctrine that can be applied mechanically, as has been recently discussed at length by this Court.[25] Despite this lack of mechanical application, "[t]he common thread in all definitions of bad faith given is that there is some kind of dishonest motive or purpose. There is, thus, the implication of an element of scienter."[26] In *Rodman Constr. Co., Inc. v. BPG Residential Partners, V, LLC*, this Court provided an illustrative example of the distinction between good faith and bad faith:

> Therefore, a finding by the Court that defendants withheld payments due because of an honest dispute about the acceptability of the work performed or legitimate potential set-offs against claims plaintiffs were asserting under the contract would augur in favor of good faith. A determination, however, that defendants were

---

[20] 25 *Del. C.* § 2729(a).
[21] *Id.*
[22] *Id.*
[23] *Rodman Constr. Co., Inc. v. BPG Residential Partners, V, LLC*, 2013 WL 656176, at *16 (Del. Super. Jan. 8, 2013) ("For the claims and counterclaims asserted by the parties, the Court must therefore determine whether they were 'not in good faith,' 'frivolous,' 'in bad faith,' or 'grossly overstated.' ").
[24] 25 *Del. C.* § 2729(a).
[25] *Rodman Constr. Co., Inc. v. BPG Residential Partners, V, LLC*, 2013 WL 656176, at *16 (Del. Super. Jan. 8, 2013); *see also Brittingham v. Bd. of Adjustment of City of Rehoboth Beach*, 2005 WL 1653979, at *1 (Del. Super. Apr. 26, 2005).
[26] *Nason Constr., Inc. v. Bear Trap Commercial, LLC*, 2008 WL 4211649, at *7 (Del. Super. Aug. 20, 2008).

instead holding payments "hostage" as bargaining leverage against plaintiffs in disputes unrelated to the contract or generally as a sharp-elbowed negotiation tactic would lead to the opposite conclusion.[27]

Daystar disputed all of Burt's claims, which totaled $224,935.00. However, by Sills' own admission at trial, $89,229.81 of this total was not in dispute.[28] Daystar should have paid this amount to Burt before the mechanics' lien was discharged. Accordingly, Burt contends this Court should subject that amount to double damages.

The Court is convinced that, under the facts of the case, Daystar grossly overstated the disputed amount of the claim. At trial, Daystar submitted into evidence a letter it sent Burt after it learned that Burt had filed suit. In an attempt to settle the matter, the letter stated, "Daystar is dumbfounded as to why Burt would pursue litigation against Defendants when it is required, pursuant to the Releases and the Subcontract, to indemnify Defendants for the costs, expenses, and legal fees associated with the litigation that it chose to file."[29] Additionally, Sills testified that Daystar withheld payments in anticipation of legal fees.[30] Daystar did not have the right to hold sums otherwise due to Burt based on potential claims it was contemplating against Burt or it anticipated Burt might bring against them.[31] Section 2729(a) was designed to prevent this type of leverage bargaining. After careful analysis of the record, the Court finds that Daystar grossly overstated the disputed amount of the claim. As a result of this finding, an additional award of damages is appropriate.

### C. Back Charges for Breach of Contract

Under the Agreement, Daystar had the right to cure or supplement Burt's work if Burt did not complete work timely or in accordance with the Agreement. This right to cure or supplement

---

[27] *Rodman Constr. Co., Inc.*, 2013 WL 656176, at *17.
[28] Transcript at 57:14-58:15.
[29] *Id.* (emphasis in original).
[30] Transcript at 57:14-58:15.
[31] *Rodman Constr. Co., Inc.*, 2013 WL 656176, at *17.

9

can be found in several provisions within the Agreement. One such provision is found in Article IV of the Agreement, which states, in pertinent part:

> If after notification from the Contractor, the Subcontractor fails to bring the Work back on schedule, the Contractor reserves the right to do whatever it deems necessary to maintain the Work schedule. This includes, but is not limited to, completing the Work or hiring third parties to complete the Work covered under this agreement. Any costs incurred by the Contractor will be the sole responsibility of the Subcontractor.[32]

Another provision, found in Article XII of the Agreement, states:

> If Subcontractor defaults or neglects to carry out the Work in accordance with this Subcontract, and fails within three days after receipt of written notice from the Contractor to commence and continue correction of such default or neglect with diligence and promptness, the Contractor, without prejudice to any other remedy the Contractor may have, may supplement the Subcontractor with its work or correct such deficiencies, and all such costs thereof, including overhead, profit and attorneys' fees, will be charged back to the Subcontractor.[33]

At trial, it was clear that both parties had different interpretations as to what form of notice was required under the Agreement.

Under Delaware law, "when interpreting a contract, the role of the court is to effectuate the parties' intent."[34] Contract terms are ambiguous if they are "reasonably or fairly susceptible of different interpretations."[35] "In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing."[36] This Court granted summary judgment in favor of Daystar in part because Burt failed to provide written notice of its change orders.[37] Daystar required Burt to provide written notice for change orders; therefore, when notice is required under the

---

[32] DTX, Tab 1 at Article IV.
[33] DTX, Tab 1 at Article XII.
[34] *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008).
[35] *Id.*
[36] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997).
[37] *D.W. Burt Concrete Constr., Inc. v. Dewey Beach Enterprises, Inc., et al.*, 2015 WL 1788741, at *1 (Del. Super. Apr. 16, 2015) (ORDER) ("Additionally, Burt may not seek recovery for any of the change orders due to the failure to follow contractual notice provisions. The contract between Burt and Day Star provided that all change order requests must be made with prior written approval from Day Star.").

Agreement, it must be done in writing. The Court is satisfied that, under the Agreement, when either party intended to complete work outside the scope of the contract or work outside its contractual obligations, written notice was required.

Both parties to the Agreement have asserted claims for breach of contract. Burt argues that it substantially performed its contractual duties and is entitled to the balance of the contract. Daystar contends that Burt's performance was neither timely nor satisfactory and is therefore entitled to an offset for expenses it incurred on behalf of Burt for its delay. At the core of this breach of contract dispute are several back charges. For the sake of clarity, the Court will address each seriatim.

## 1. Footings ($6,227.35)

At trial, Daystar submitted an invoice for footings it contends Burt was responsible for pouring. Daniel testified that Burt did not pour these footings because they were not within the scope of the Agreement or shown on the plans he received.[38] Daniel further explained that the footings Daystar seeks to offset are the type of footings used to support masonry walls. By contrast, Burt contracted to erect a post-tensioned structure that requires a foundation of pile caps and grade beams. In rebuttal, Sills testified that, even though the Agreement included an express reference to pile caps and grade beams,[39] Burt was responsible for pouring any type of footing required on site. The Court finds Daniel's testimony more persuasive.

Whether the footings fall within the scope of the Agreement is inconsequential. Under the Agreement, Daystar was required provide Burt with written notice that it intended it intended to supplement Burt's work by pouring the footings. At trial, Sills testified that Daystar failed to

---

[38] Transcript at 100:5-101:22.
[39] See DTX, Tab 1 at *11.

11

give written notice.[40]  Accordingly, since written notice was required under the Agreement, Daystar is not entitled to a set-off for the footings.

## 2.  Broken sanitary sewer pipe ($2,760.00)

Daystar contends that Burt drove a form pin through a sanitary sewer pipe that was discovered after Burt completed the job.  As a result, Daystar claims it had to cut and patch the concrete itself and pay a plumber to repair the pipe.  At trial, Daniel testified that Robert Miller, a Burt employee, received a phone call from the superintendent, Rick McCoy, informing him that Burt needed to return to the job site to fix a pipe that Burt had driven a steel pin through.  Once at the site, Burt broke through the concrete and discovered that there was no pin driven through the pipe but, instead, a fitting on the pipe had not been glued properly.  After the plumber repaired the pipe, Burt poured the concrete back in place and patched the hole.  Sills rebutted Daniel's testimony and claimed the invoice Daystar submitted at trial was in reference to a different broken sanitary sewer pipe.  However, Daystar did not offer any evidence indicating it tried to contact Burt about the other broken sanitary sewer pipe.  Furthermore, the description in the invoice admitted at trial—"repair broken sewer line in concrete parking garage"—does not indicate the cause of the broken pipe.[41]  Therefore, Daystar is not entitled to a set-off for this back charge.

## 3.  Labor for removing shoring ($3,600.00)

Daystar submitted an invoice incurred on behalf of Burt for labor to remove shoring.  Again, Sills testified Daystar did not provided Burt with written notice with respect to this charge.  Accordingly, Daystar is not entitled to a set-off for the labor used to remove the shoring.

---

[40] Transcript at 81:2-7.  ("Q.  Did you ever give D.W. Burt written notice that if you don't do this work within 48 hours, we are going to do it and charge you back for it in accordance with the provisions of your own contract?  A. No, we did it in a meeting verbally and he understood it.").
[41] DTX, Tab 3 at *7.

**4. Grinding of CIP walls ($2,580.00), finishing of stair tower and pool area walls ($11,294.00), and underside of balconies ($3,249.00)**

The Court will address these charges together since all three concern whether the quality of Burt's work product met the performance standard required under the Agreement. At trial, Daniel testified that all the work completed by his company was within the industry standard. Furthermore, Daniel testified that Sills never provided him with a written punch list after the job was done, and Sills could not state affirmatively that he had. The Court finds Daniel's testimony more persuasive. Had these imperfections been as glaring as Daystar contended they were, they should have been in writing and provided to Burt. This notion is highlighted by the terms of the Agreement that condition final payment on Burt's completion of a written punch list. [42] Burt cannot be asked to pay for repairs about which it was never informed. Accordingly, Daystar is not entitled to a set-off for these amounts.

**5. Improper elevation on slabs ($6,500.00) and out-of-plumb stair tower ($10,750.00)**

At trial, Sills testified that certain concrete slabs did not meet specified elevation requirements and that the stair tower was out of plumb. However, Sills did not offer expert testimony regarding these matters. Daniel testified that when the concrete slabs were poured, a surveyor employed by Daystar would shoot the elevation at each level to establish a benchmark for the following slab. He testified further that during construction Burt was never notified about any elevation problems. With respect to the stair tower, Daniel testified that the tower complied with industry standards; however, like Sills, he did not offer expert testimony to support his assertions.

---

[42] DTX, Tab 1 at Article IX ("Final payment to the Subcontractor shall be made after Subcontractor completes punch lists, . . . .").

After a careful review of the record, the Court finds Daniel's testimony to be more credible. At the outset, the invoice Daystar submitted to support its set-off claim for the stair tower is dated May 15, 2015—long after Burt completed the work and only fifteen days before trial. Furthermore, Daniel testified that Burt never received written notice about these issues. In fact, Daniel testified that the first time he heard about these particular issues was the day of the trial. In light of this evidence, the Court finds that Daystar has not established this claim by a preponderance of the evidence and is not entitled to a set-off for these charges.

## 6. Supervision ($35,000.00)

Daystar argues that since Burt was substantially behind schedule, it is entitled to a setoff for the cost of supervision on the job site. That is, Burt's untimely performance was a breach of contract and the sole reason that prolonged supervision was required. Although the Agreement contained a boilerplate "time is of the essence" condition, it did not set a definite completion date. Moreover, the schedule submitted at trial was changed several times according to the testimony of both parties.[43]

After analyzing the record, the Court finds that Burt's performance did not significantly delay the Project. Specifically, Daniel testified that Daystar was supposed to provide Burt with a dewatering permit to begin construction but failed to do so. In addition, in October 2012, Hurricane Sandy flooded Dewey Beach causing delay in construction. Daniel further testified that Daystar provided the plans for the Project on a per floor basis, a process that further delayed construction because Burt could only order the necessary materials, which took up to two weeks for delivery, when he had the plans.[44]

---

[43] Transcript at 74:1-15.
[44] Transcript at 117:10-20.

Daystar failed to prove, by a preponderance of the evidence, that the delay in construction was entirely attributable to Burt. Any delays that were attributable to Burt, as discussed above, were caused by external factors not within its control. Moreover, Burt was not the only subcontractor on the job site and, thus, not the only reason a superintendent was required to be present. In addition, under the Agreement, Daystar was required to provide Burt with written notice of the need to provide supervision but failed to do so. Daystar is not entitled to a set-off for supervision.

## D. Legal Fees

Daystar is seeking legal fees pursuant to Article XIII in the Agreement, which states, in pertinent part:

> If it is necessary to enforce any provision of this Subcontract, Contractor shall be reimbursed by Subcontractor for all legal and other reasonable costs related thereto, including attorneys' fees, court costs, administrative time, and other collection costs, whether or not Contractor initiated court proceedings or arbitration.[45]

At trial, Sills testified that he interpreted this provision to mean that irrespective of which party is at fault, Burt was responsible for all legal fees.

Although there is no Delaware case law directly on point, other states that have interpreted similar provisions and refused to enforce them. For example, in *First Atlantic Bldg. v. Neubauer Constr. Co.*,[46] the breaching party sought payment of legal fees pursuant to a contractual provision similar to the provision at issue here. The court rejected this argument and stated, "It would be an anomaly to permit a party who breaches a contract to rely on the same contract to reimburse it for expenses, such as attorney's fees, which arose out of the breach."[47]

---

[45] DTX, Tab 1 at Article XIII.
[46] *First Atlantic Bldg. v. Neubauer Constr. Co.*, 352 So. 2d 103, 106 (Fla. Dist. Ct. App. 1977).
[47] *Id.*; *see also Vaks v. Ryan*, 2014 WL 861465, at *2 (Mass. App. Div. Feb. 28, 2014) (refusing to enforce a contract provision that awarded legal fees to one party regardless of who prevailed).

The Court agrees with this reasoning. Under Delaware law, a court need not adopt an interpretation of a contract term "contrary to both the plain meaning of the document and logic, and to reach an unfounded, absurd result."[48] After careful analysis of the record, Daystar's interpretation is unreasonable because Daystar necessitated the suit by breaching the contract by failing to pay the undisputed sum. Allowing Daystar to recover its legal expenses will only serve to diminish the amount of Burt's claim that Burt has proven it is entitled to recover. Therefore, as the breaching party, Daystar is not entitled to recover legal fees incurred defending this action.

## VI. CONCLUSION

For the foregoing reasons, verdict is entered for Plaintiff Burt on Counts I and II in the Complaint in the amount of $314,164.81 together with costs and present and past interest at the legal rate of 5.75%[49] from July 24, 2013.[50] This sum represents the balance of the contract price plus an additional $89,229.81 as damages for Daystar's gross overstatement of the disputed amount.

**IT IS SO ORDERED.**

---

[48] *Rhone-Poulenc Basic Chemicals Co. v. Am Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).
[49] Pursuant to 10 *Del. C.* § 2301, the legal rate of interest in the State of Delaware is the Federal Reserve Discount rate plus five percent.
[50] Burt's final invoice was submitted on July 24, 2013. *See* DTX at Tab 4.