# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CYNTHIA H. HALL and SHELLEY I. CARTER, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 2023-0253-BWD |
| | ) |
| BEVERLY A. MUNDY, CHAVEZ T. WILLIAMS, ROSALYN WILLIAMS CARROLL, MICHAEL NIXON, KEITH MASON, KATHY GREEN, KIM BROWN, KYLE MASON, DALE YOUNG SR., and unknown heirs of FRANCES MASON, | ) |
| | ) |
| Defendants. | ) |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: December 20, 2024
Date Decided: January 8, 2025

Jaclyn Quinn, DCRAC LAW, Wilmington, Delaware; *Attorneys for Plaintiffs Cynthia H. Hall and Shelley I. Carter*.

Dean Campbell, LAW OFFICE OF DEAN A. CAMPBELL, P.A., Milton, Delaware; *Attorneys for Defendants Beverly A. Mundy, Chavez T. Williams, Rosalyn Williams Carroll, Michael Nixon, Keith Mason, Kathy Green, Kim Brown, Kyle Mason, Dale Young Sr., and unknown heirs of Frances Mason*.

**DAVID, V.C.**

In this action, plaintiffs Cynthia Hall and Shelley Carter ("Plaintiffs") challenge intestate transfers through which real property belonging to the late Mariah Jane Walters—who they contend was their paternal grandmother—passed to Mariah's[1] only surviving child, Chester George Walters Jr. ("Chester Jr."), and then to Mariah's sister, Frances Mason, and later to Frances's heirs. Plaintiffs seek to establish, under Title 12, Section 508 of the Delaware Code, that they are the children of Mariah's predeceased son, Joshua H. Walters, and should have inherited an interest in Mariah's real property upon her death.

At trial, Plaintiffs proved by a preponderance of the evidence that Joshua was their father, and Defendants failed to establish that this action is barred by the equitable doctrine of laches. Accordingly, judgment is entered in Plaintiffs' favor on their claim to quiet title to the subject property.

## I. BACKGROUND

The following facts are drawn from factual stipulations in the parties' Pre-Trial Stipulation and Worksheet and the evidence presented at a one-day trial held on September 20, 2024.[2]

---

[1] This post-trial memorandum opinion refers to members of the Walters and Mason families by their first names for clarity; no disrespect or familiarity is intended.

[2] The Pre-Trial Stipulation and Worksheet is cited as "PTS at __." Trial testimony is cited as "Tr. (Witness) at __." Trial exhibits are cited as "PX" or "DX."

## A.    The Walters And Mason Families

Mariah and Chester Walters Sr. ("Chester Sr."), now both deceased, were parents to four children.[3]  Two daughters died at an early age,[4] but two sons—Chester Jr. and Joshua—lived to adulthood.[5]

Chester Jr. never married and had no children.[6]  Joshua also never married,[7] but the parties dispute whether he ever had children.  Plaintiffs contend that, although "no court papers" were ever filed to establish paternity,[8] they and their late sister, Valerie R. Hall, are the daughters of Joshua and Emily C. Hall.[9]  The chart included on the attached Appendix illustrates the Walters family relationships, assuming Plaintiffs are correct that they are Joshua's children.

Mariah had one sister, Frances Mason.[10]  Frances had five children: Freddie Mason, Stanford Williams, William Buck, Ruthann Mason, and Alice White.[11]

---

[3] PX 4.

[4] *Id.*; Tr. (Shelley) at 20.

[5] PX 6; PX 7.

[6] PX 7; PTS at 4.

[7] PX 6.

[8] Tr. (Shelley) at 27; *id.* (Cynthia) at 42.

[9] *Id.* at 27, 33; PTS at 8; PX 3.

[10] PTS at 5.

[11] Tr. (Chavez) at 52.

Freddie had five children: Keith, Kyle, Kathy, Kim, and Dale.[12] Stanford had four children: Arnold,[13] Beverly, Chavez, and Rosalyn.[14] William did not have children.[15] Ruthann had three children: Norris (nicknamed "Peanut"), Poochie, and Michael.[16] Alice had two children: Vicky and Vanessa.[17] The chart included on the attached Appendix also depicts the Mason family relationships.

**B.**      **Joshua And Mariah Treat Plaintiffs Like Family.**

At trial, Shelley and Cynthia credibly testified to having a close relationship with both Joshua[18] and Mariah.[19] Shelley testified that growing up, Plaintiffs lived with their mother, Emily, but they "spent time [with Joshua] at his mother's house where he lived, and [Joshua] spent time at [the] house where [Plaintiffs and their]

---

[12] *Id.* at 52–53.

[13] Arnold died in 2013. *Id.* (Chavez) at 54. He had three children: Teisha, Tanya, and Tony. *Id.*

[14] *Id.*

[15] *Id.* at 53.

[16] *Id.*

[17] *Id.*

[18] *Id.* (Shelley) at 6, 9 (Shelley testifying that she was "real[ly] close to . . . [her] father," had a "good relationship with him," and "was right up under him all the time"); *id.* (Cynthia) at 35–36 (Cynthia testifying that she had a "good" relationship with Joshua but "didn't have the opportunity to spend as much time with [her] dad as Shelley because [she] was the youngest, and [Joshua spent] several years . . . in Emily P. Bissell Hospital").

[19] *Id.* (Shelley) at 9 (Shelley testifying that she called Mariah "mom" and "was real[ly] close to [her] grandmom and [her] uncle"); *id.* (Cynthia) at 36 (Cynthia testifying that she "had a good relationship" with Mariah, "visited with [Mariah,] . . . cooked with her[,] . . . talked with her[,]" and "did things with her").

3

mother lived."[20]   As children, Plaintiffs visited with Joshua and went to Mariah's

house "on the weekends" and after school.[21]   Throughout their childhood, Plaintiffs

also regularly visited with Frances and her children and grandchildren,[22] to whom

Plaintiffs were introduced as "cousins."[23]

Joshua passed away on January 10, 1973,[24] when Shelley was seventeen years

old and Cynthia was fifteen years old.[25]   After Joshua's death, Plaintiffs and Mariah

---

[20] *Id.* (Shelley) at 6–7, 18.

[21] *Id.* (Cynthia) at 36.

[22] *See id.* (Shelley) at 7 (Shelley testifying that she would see Frances "when she came down to Mariah's for camp.  And once in a while [Mariah] would go up to their house where she lived [on weekends]"); *id.* at 8 (Shelley testifying that she and Mariah "went to see . . . Frances" and "saw Ruthann and her boys, Michael and . . . Norris[,] . . . [who] stayed with . . . their grandma"); *id.* (Shelley explaining that Frances, Stanford, Buck, and Freddie "would stop by" Mariah's house to visit; "[w]hen Michael and [Norris] would come down, and sometimes Poochie[,]" Shelley would "play with them"; and Shelley also "play[ed] with Rosalyn [when Stanford] used to pick [Shelley] up and take [her] to their house"); *id.* (Shelley testifying that Plaintiffs and members of the Mason family would join the Walters family for "camp" at Mariah's home "[e]very July"); *see also id.* (Chavez) at 55–56 (Chavez testifying that he saw Plaintiffs "[d]uring times that [his family] spent down in the country with them . . . during the summers [his family] would go visit down lower Delaware . . . [when he w]as a child").

[23] *Id.* (Chavez) at 56 (Chavez testifying that "[w]hen [they] were young . . . [Plaintiffs and Frances's grandchildren] were introduced to [each other] as . . . cousin[s]").

[24] PX 6.

[25] Tr. (Shelley) at 16; *id.* (Cynthia) at 36.

4

remained close,[26] and Mariah "helped [Emily] apply for social security for survivor's benefits for" Plaintiffs and their sister, Valerie.[27]

## C. The Property Passes Through Intestate Succession.

On December 12, 1939, Mariah took title to real property located at 32298 Powell Farm Road in Frankford, Delaware (the "Property").[28] Chester Sr. died in 1955.[29] Mariah died intestate on August 20, 1975.[30] Mariah and Chester Sr.'s only living child, Chester Jr., continued to live at the Property.[31]

On September 19, 1975, Chester Jr. filed a petition for letters of administration with the Sussex County Register of Wills, listing himself as Mariah's

---

[26] *See, e.g., id.* (Shelley) at 9 (Shelley testifying that she saw Mariah "every day" and when Mariah "got sick[,]" Shelley "[a]nd [her] sisters . . . stayed with [Chester Jr.] while [Mariah] was in the hospital"); *id.* (Cynthia) at 36 (Cynthia testifying that Plaintiffs would visit Mariah after school "two or three times a week[,]" they were at Mariah's home "most of the time on the weekends[,]" and they "saw her on . . . Sunday[s for] church"); *id.* at 37–38 (Cynthia testifying that Mariah "helped [Plaintiffs] continue living life" after Joshua passed away, and "help[ed] . . . take care of [them] when [their] mother was at work or [they] needed to go somewhere, because underage [they] would go out there and visit, stay with [Mariah] and [Chester Jr.]").

[27] *Id.* (Cynthia) at 38, 44. At trial, Defendants objected to the admission of a letter from the Social Security Administration that was addressed to Cynthia. *See* PX 9. Because I have not relied on that document in making the findings herein, I do not address its admissibility.

[28] PTS at 4; PX 13; DX 1.

[29] PX 5.

[30] *Id.*; DX 2.

[31] Tr. (Shelley) at 9.

only next of kin.[32]  Chester Jr. died intestate two years later, on September 9, 1977.[33]

On October 4, 1977, an attorney submitted a letter to the Sussex County Register of Wills identifying Frances as the "next of kin of both Mariah Walters (sister) and Chester George Walters, Jr.[] (nephew)[.]"[34]  Jeni L. Coffelt was named successor administratrix for both Mariah's and Chester Jr.'s estates.[35]  On May 23, 1978, Coffelt filed with the Register of Wills (1) an inventory for Mariah's estate, which listed the Property as real estate and identified Chester Jr. as beneficiary;[36] (2) a first and final accounting for Mariah's estate;[37] (3) an inventory for Chester Jr.'s estate, which listed the Property as real estate and identified Frances as beneficiary;[38] and (4) a first and final accounting for Chester Jr.'s estate.[39]

Frances passed away on July 8, 1982, but no estate was opened at that time.[40] Neither Frances nor her heirs ever recorded a deed transferring the Property.  Since Frances's death, Sussex County property records have identified the owners of the

---

[32] PX 13; DX 2.

[33] PX 7; DX 9; DX 10.

[34] DX 5.

[35] DX 6; DX 11.

[36] DX 8.

[37] DX 9.

[38] DX 12.

[39] DX 13.

[40] *See* DX 14.

6

Property as "Frances Mason Heirs."[41]  On September 8, 2023, Chavez filed a petition for authority to act as personal representative of Frances's estate, listing only himself and his sisters Beverly and Rosalyn as next of kin.[42]

At some point after Chester Jr.'s death in 1977, "[Mariah's] house disappeared" from the Property and "a trailer was put there."[43]  Stanford paid taxes on the Property and used it "[o]ff and on" as a vacation property throughout the 1980s and until his death in the late 1990s.[44]  At some point, the trailer on the Property burned down.[45]

After Stanford's death, his son Arnold began paying taxes on the Property and used it for a vacation home.[46]  In May 1999, Arnold and his wife, Ruth, "purchased a doublewide to replace the older trailer" that had burned.[47]  Arnold passed away in 2013, and the doublewide trailer was later repossessed.[48]

---

[41] *See* PX 13; DX 16.

[42] PX 13; DX 14.

[43] Tr. (Shelley) at 11, 14.

[44] *Id.* (Chavez) at 58–59 (Chavez testifying that Stanford "would go down and stay for maybe like a week, hunting"); *see* DX 16.

[45] Tr. (Shelley) at 14, 28, 31.

[46] *Id.* (Chavez) at 60–62; *see* DX 16.

[47] Tr. (Chavez) at 60; DX 15.

[48] Tr. (Chavez) at 54, 62; *id.* (Shelley) at 14.

Taxes on the Property went unpaid for several years until Shelley took over payment in 2018.[49] On February 28, 2023, Plaintiffs initiated this action through the filing of a Complaint to Quiet Title.[50] The Court held a one-day trial on September 20, 2024,[51] and post-trial briefing concluded on December 20, 2024.[52]

## II. ANALYSIS

The statutory scheme of intestate succession deals with the distribution of property not effectively disposed of by will.[53] If a decedent does not have a surviving spouse, intestate property passes to her issue, per stirpes.[54]

Plaintiffs contend that when Mariah died in 1975, the Property should have passed through intestate succession, with a one-half interest to Chester Jr. and a one-half interest to Plaintiffs, as Joshua's heirs.[55] Defendants, in response, contest that Plaintiffs are entitled to inherit from Joshua as his children.[56] They further argue that even if Plaintiffs were entitled to inherit a one-half interest in the Property in

---

[49] *Id.* (Shelley) at 30; *id.* (Chavez) at 62; PX 11; DX 16.

[50] Dkt. 1.

[51] Dkt. 40.

[52] Pls.' Post-Trial Br. [hereinafter POB], Dkt. 44; Defs.' Answering Post-Trial Br. [hereinafter DRB], Dkt. 45; Pls.' Post-Trial Reply Br. [hereinafter PRB], Dkt. 47.

[53] 12 *Del. C.* § 501.

[54] 12 *Del. C.* § 503(1).

[55] PTS at 8; POB at 3.

[56] PTS at 7; DAB at 5, 9.

1975, their delay in asserting a claim to the Property should bar relief under the equitable doctrine of laches.[57]

### A. Plaintiffs Proved By A Preponderance Of The Evidence That Joshua Was Their Father.

"The standard of evidence for proving that a child born out of wedlock is the child of a man who is deceased is preponderance of the evidence. The phrase 'preponderance of the evidence' is defined to mean 'the greater weight of the evidence.'" *In re Est. of Cheers*, 1998 WL 83036, at *2 (Del. Ch. Feb. 9, 1998) (citations omitted) (first citing 12 *Del. C.* § 508(2)(b); then citing *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967); and then citing *Oberly v. Howard Hughes Med. Inst.*, 472 A.2d 366, 390 (Del. Ch. 1984)).

Under Title 12, Section 508 of the Delaware Code, "[i]f, for purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through, or from a person[,]" a child born out of wedlock is a child of the father if: (1) "legitimated pursuant to Chapter 13 of Title 13;"

---

[57] Before trial, Defendants advanced an adverse possession theory, but did not address it in post-trial briefing. *See* Def. Chavez T. Williams['s] Answer & Countercl. to the Compl. for Quiet Title, Count I (Adverse Possession), Dkt. 11; PTS at 6, 8, 13 (referencing an adverse possession argument). That theory is therefore waived. *See Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial." (first citing *SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 WL 1707891, at *12 n.71 (Del. Ch. June 16, 2009); and then citing *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001))).

(2) "[t]he natural parents participated in a marriage ceremony before or after the birth of the child, even though the attempted marriage is void;" or (3) paternity is established after the death of the father "by preponderance of the evidence." 12 *Del. C.* § 508(2).

Plaintiffs agree that they were never "legitimated" under Title 13, Chapter 13, and that Joshua and their mother, Emily, never participated in a marriage ceremony. Instead, they seek to establish paternity by a preponderance of the evidence.

The evidence adduced at trial supports a finding, by a preponderance of the evidence, that Joshua was Plaintiffs' father. Witnesses at trial credibly testified that Plaintiffs were close to Joshua and his mother, Mariah; regularly visited with Joshua at Mariah's house on weekends and after school; visited and had relationships with Joshua's and Mariah's other family members; and remained close with Mariah even after Joshua's death.[58] Plaintiffs therefore met their burden to prove that Joshua was their father. *See In re of Est. of Evans*, 2024 WL 3495809, at *3 (Del. Ch. July 22, 2024) (crediting testimony that an individual attended family reunions and visited his alleged father as a child); *Est. of Koon*, 1984 WL 136929, at *1 (Del. Ch. Dec. 11, 1984) (summarizing evidence that an individual was "treated like one of the family" by his alleged father's family members).

---

[58] *See supra* notes 18–27 and accompanying text.

Accordingly, Plaintiffs have established that they were entitled to inherit a fifty-percent interest in the Property through Joshua.[59]

## B.    Laches Does Not Bar This Action.

Defendants contend that even if Plaintiffs met their burden to prove paternity, their request to quiet title to the Property in their favor is barred by the equitable doctrine of laches.

"The doctrine of laches protects defendants from prejudice by prohibiting the unreasonably slow filing of equitable claims." *Quill v. Malizia*, 2005 WL 578975, at *14 (Del. Ch. Mar. 4, 2005) (first citing *Wright v. Scotton*, 121 A. 69, 72 (Del. 1923); and then citing 27A Am. Jur. 2d *Equity* § 141). "To sustain a laches defense, a defendant must show that it was prejudiced because the plaintiff unreasonably delayed bringing suit after being on at least inquiry notice of its claims." *Id.* (first citing *Fed. United Corp. v, Havender*, 11 A.2d 331, 334 (Del. 1940); and then citing *Fike v. Ruger*, 752 A.2d 112, 113 (Del. 2000)). Defendants assert that the defense

---

[59] Defendants also contend that Plaintiffs did not prove by a preponderance of the evidence that Joshua was Mariah's son. At trial, Plaintiffs introduced into evidence a birth certificate for "Harry Leonard Walters," born on February 20, 1929, listing "Maria Rogers" as mother and "Chester Walters" as father. *See* PX 4; PX 5 (confirming Mariah's maiden name was Rogers). Although Plaintiffs could not explain why the name on Joshua's purported birth certificate was "Harry" instead of "Joshua," they also introduced into evidence a death certificate for "Joshua H. Walters," born on February 20, 1929, listing "Mariah Walters" as mother and "Chester Walters" as father. PX 6. The death certificate provides persuasive evidence that Joshua was, in fact, Mariah's son.

applies here because (1) "there were multiple filings with the Sussex County Register of Wills which omitted Joshua Walters as an heir to Mariah Walters' Estate" and instead "pointed ownership of the Subject Property to Franc[e]s Mason[,]" yet Plaintiffs never took action to confirm that the Property had passed to them through intestate succession; and (2) as a result of Plaintiffs' delay in seeking to quiet title to the Property, "[p]eople familiar with the relationship between Joshua Walters and Plaintiffs [we]re no longer available to testify about the relationship" at trial.[60]

In fact, Plaintiffs did not fail to assert their rights; rather, they "believed the property was considered 'heirs property' and that they did not need to act."[61] Neither Frances nor her heirs ever executed and recorded a deed transferring ownership of the Property, making it reasonable for Plaintiffs to believe they were among the heirs with an ownership interest in the Property.[62] *See Mitchell v. Dorman*, 2004 WL 117580, at *4 (Del. Ch. Jan. 16, 2004) (rejecting a laches defense where "it was reasonable for [plaintiff] to assume that her rights in the [subject property] were secure, and there was no reason for her to bring a suit to quiet title or take any other action to assert her rights"), *aff'd*, 860 A.2d 810 (Del. 2004).

---

[60] DAB at 12.

[61] POB at 13; Tr. (Shelley) 21–24, 27–28.

[62] Plaintiffs' belief that their rights to the Property were secure is further supported by Shelley's payment of taxes on the Property since 2018. *See supra* note 49 and accompanying text.

Defendants contend that Plaintiffs should have known their rights to the Property were in dispute because filings with the Register of Wills identified Chester Jr., and then Frances, as the "beneficiary" of the Property. But the Property passed directly to Mariah's heirs, including Plaintiffs, upon her death[63]—incorrect estate filings did not, and could not, change that fact. At best, the Register of Wills filings could have put Plaintiffs on notice that Defendants might challenge their ownership interest; but on the other hand, Frances's heirs similarly took no action to protect their own rights, including by recording a deed to the Property.

Defendants also argue that they have been prejudiced by Plaintiffs' failure to bring suit sooner, due to the loss of evidence with the passage of time. The same can be said of Defendants' failure to assert their own rights to the Property.[64]

---

[63] *See, e.g.*, *In re Est. of Sexton*, 2007 WL 2303915, at *1 (Del. Ch. Aug. 8, 2007) ("[T]itle to the real estate of a decedent does not pass to the executor but passes directly to the heirs." (citing *Parsons v. Garrison*, 1979 WL 178570, at *1 (Sept. 17, 1979))); *In re Est. of Morrell*, 1995 WL 783075, at *4 (Del. Ch. Dec. 26, 1995) ("[R]eal estate, at the death of a decedent, passes directly to the intestate heirs, if there is no will . . . . It is well settled in Delaware that the title to real estate descends to the heirs or vests in the devisees immediately upon the death of the testator subject to be divested if it be necessary to sell it for the payment of debts of the deceased.'" (quoting *In re Harris' Est.*, 44 A.2d 18, 19 (Del. Orphans' Ct. 1945))).

[64] "Death of a potential witness does not automatically cause prejudice to a defendant . . . . The particular circumstances of the case must be considered as well as the significance of the deceased's likely testimony." *Procek v. Hudak*, 2000 WL 546079, at *3 (Del. Ch. Apr. 20, 2000) (citing *Skouras v. Admiralty Enter., Inc.*, 386 A.2d 674, 682 (Del. Ch. 1978)), *aff'd and remanded on other grounds*, 806 A.2d 140 (Del. 2002). Defendants also cannot

Defendants have not otherwise suffered prejudice due to Plaintiffs' purported delay. Between Frances's passing in 1982 and the filing of this action in February 2023, no Defendant made any filing with the Register of Wills concerning the Property. Several estates still must be probated before any named owners can be identified in a chain of title. And here, the Property itself has not been improved; it is currently a vacant lot.[65] Under the circumstances, Defendants have not identified any cognizable prejudice, and their laches defense fails.

## III. CONCLUSION

For the reasons set forth above, judgment is entered in Plaintiffs' favor on their claim to quiet title to the Property. The parties are directed to submit a proposed form of implementing order.

---

claim prejudice from the death of certain family members when any purported "interest[s] in the property would not exist but for [those family members'] death[s]." *Hudak v. Procek*, 806 A.2d 140, 155 (Del. 2002).

[65] *Compare Robert O. v. Ecmel A.*, 460 A.2d 1321, 1325–26 (Del. 1983) (noting that "[s]ubstantial improvements to property may constitute sufficient prejudice to support a finding of laches" if there is "a causal relationship between the delay and the alleged prejudice"), *overruled on other grounds by Sanders v. Sanders*, 570 A.2d 1189 (Del. 1990).

# APPENDIX[i]

## Walters Family



## Mason Family



---

[i] The Walters Family chart assumes that Plaintiffs and their deceased sister, Valerie, are Joshua and Emily's children. Both charts were compiled using information from the Pre-Trial Stipulation and Worksheet, the trial transcript, and trial exhibits, but are included for illustrative purposes only and do not, in themselves, constitute findings of fact. *See* PTS at 4–5, 8; Tr. (Shelley) at 20, 27; *id.* (Chavez) at 52–54; PX 1–7; DX 2–14.