# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OPTIMISCORP, a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2020-0183-MTZ |
| WILLIAMS ATKINS, GREGORY SMITH, and JOHN WAITE, | ) ) ) | |
| Defendants. | ) ) ) | |

# MEMORANDUM OPINION

Date Submitted: October 3, 2025
Date Decided: May 11, 2026

Theodore A. Kittila, William E. Green, Jr., HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware, *Attorneys for Plaintiff*.

Stephen B. Brauerman, Sarah T. Andrade, Megan A. McGovern, BAYARD, P.A., Wilmington, Delaware, *Attorneys for Defendants*.

**ZURN, Vice Chancellor**

Over a decade ago, three stockholders took on the mantle of derivative plaintiffs and filed derivative claims against the board of a company and its former outside counsel. The claims against the former outside counsel proceeded to arbitration, and the stockholders prevailed and were awarded monetary relief. The stockholders tried to keep that award out of the hands of the company's controller. The company filed suit to reclaim it. Earlier in the case, I entered summary judgment on the breach of fiduciary duty claim in the company's favor, but only as to liability. I found that the stockholders owed fiduciary duties as agents of the company, and that they breached those duties by divesting the company of its authority to manage the award.

The parties went to trial on the issue of damages. The company contends that retaining the award was part of a broader scheme to drive the company out of business. But the company failed to prove any damages caused by missing the award. The company is entitled to nominal damages.

## I.    BACKGROUND[1]

The parties tried damages over three days, offering the Court over 600 joint exhibits and live testimony from six fact witnesses and two expert witnesses. The

---

[1] Citations in the form "[last name] Tr. —" refer to trial testimony of the referenced witness, available at docket item ("D.I.") 234, D.I. 235, and D.I. 236. Citations in the form of "PTO —" refer to the parties' amended pre-trial order, available at D.I. 230. Citations in the form "POB —" refer to Optimis's post-trial opening brief, available at D.I. 239. Citations in the

1

following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[2]

### A. Optimis Suffers From Infighting, And Stockholders Pay The Price.

Plaintiff Optimis*Corp* ("Optimis" or the "Company") is a "holding company that develops software and acquires, manages, and operates physical therapy clinics around the country, purchasing such business for stock and without paying cash."[3] Optimis's physical therapy clinics are run by its wholly-owned subsidiaries, including Southern California-based Rancho Physical Therapy, Inc. ("Rancho"), Washington-based MVP Physical Therapy ("MVP"), and Florida-based Beachside Physical Therapy ("Beachside").[4] At its peak, Optimis owned and operated fifty-nine clinics out of those subsidiaries.[5] That number has dwindled to less than twenty.[6]

---

form "DAB —" refer to Defendants' post-trial answering brief, available at D.I. 241. Citations in the form "PRB —" refer to Optimis's post-trial reply brief, available at D.I. 245.

[2] *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) ("The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists.").

[3] JX 173 [hereinafter "Arb. Award"] at 5.

[4] *See, e.g.*, Price Tr. 7.

[5] *Id.*

[6] *Id.*

Defendants William Atkins, Gregory Smith, and John Waite (together "Defendants") are current Optimis stockholders, former Optimis directors, and former board members and executives of Rancho. After founding Rancho in 1984, Atkins brought on his longtime friends Waite and Smith in 1990.[7] In June 2007, Defendants sold Rancho to Optimis in a stock-for-stock transaction.[8] Defendants joined the Optimis board and stayed on as Rancho employees after the sale.[9] They brought in their friends and family as significant equity investors, including Waite's father, his best friend and neighbor, Smith's mother and younger brother, and Atkins's brother-in-law.[10]

Defendants' relationship with Optimis has been volatile. Factions emerged within the Company's board, with battle lines drawn around Optimis's CEO, Chairman, and controller Alan Morelli. Defendants disagreed with Morelli's

---

[7] Atkins Tr. 328–29; Waite Tr. 270; Smith Tr. 384–85.

[8] PTO ¶ 21; Arb. Award at 5; Waite Tr. 271–72; Atkins Tr. 329–30.

[9] Arb. Award at 5.

[10] *OptimisCorp v. Waite*, 2015 WL 5147038, at *29 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016) (TABLE) [hereinafter "Plenary Op."] ("Later in 2009, Optimis started raising capital, using a private placement memorandum ('PPM'). Waite participated and also sold his family and friends on Optimis. Smith similarly raised funds for the Company from his family, with his mother investing $80,000, his younger brother investing $200,000, and some of his friends investing a total of $500,000."); *id.* at *33 ("At the end of 2011, the Company again was in need of capital. In December 2011, Optimis had another PPM prepared. The Director Defendants . . . again answered the call. Optimis raised about $860,000, almost all of which came from two people: a friend of Waite's and Atkin's brother-in-law.").

3

leadership, particularly his management of corporate resources.[11] Tensions came to a head in October 2012 after a formal investigation into sexual harassment allegations against Morelli.[12] Morelli was removed from the board, then reinstated after litigation in this Court.[13]

The fallout would cost Defendants their livelihoods. On July 5, 2013, Defendants were terminated from their roles at Rancho, ending their decades-long careers at the company they built from scratch.[14] Defendants did not know why they were terminated.[15] Atkins testified he was "let out like a criminal in [his] own office" in the middle of seeing patients.[16] Each Defendant credibly described the termination as emotionally and financially devastating: in an instant, they lost their only source of income, their health insurance, their standing in the community,[17] and

---

[11] *See* Waite Tr. 288 (testifying that he "disagreed with the allocation of resources and the focuses of the company"). The full saga is described at length in an earlier decision. *See* Plenary Op. at *26–54; *see also* Arb. Award at 14–25.

[12] *See* Plenary Op. at *41–51; Arb. Award at 14–16.

[13] *See* Plenary Op. at *49–53; Arb. Award at 14–25; *Morelli, et al. v. Waite, et al.*, C.A. No. 8001-VCMR, at D.I. 31 (Dec. 27, 2012); *see also* PTO ¶¶ 24–25.

[14] PTO ¶ 27.

[15] Atkins Tr. 331; Smith Tr. 385.

[16] Atkins Tr. 332–33.

[17] *See id.* at 331–33 ("[W]e had such a great reputation in the communities we were in. We covered football games, we covered sports events. I did a lot of coaching as well. Called to speak at the high schools and things like that. In my own practice, I continued to see patients the entire time . . . . You know, this is my small town, I'm fired from my company. It was almost inconceivable that this had happened with the reputation that we had in town and so forth. So it was extremely stressful. One of the hardest things I've been through.").

a practice they had spent two decades nurturing.[18]  And they went from running a successful practice to starting over as part-time staff therapists at the next job they could find.[19]

A chain of litigation followed, with one lawsuit inspiring another.  On July 30, 2013, Defendants brought an employment action against Rancho (the "Employment Action"), seeking damages for wrongful termination.[20]  The Court entered judgment in their favor in August 2018, and the judgment was affirmed on November 17, 2020.[21]

While the Employment Action marched forward, in October 2015, Defendants assumed the mantle of derivative plaintiffs and filed an action in this Court against Optimis's board of directors and its former outside counsel, Allen Z.

---

[18] *See* Waite Tr. 273 ("It was devastating.  I lost my home in a short sale . . . . So we had to sell a life insurance plan to pay the bills.  I went from being [an] owner of a practice I was very proud of that I worked very hard on to not having a job.  And I lost, you know, most of what I had accumulated over the years working very hard."); Atkins Tr. 333 ("[M]y income was gone.  My health insurance was gone.  All of that was gone in one fell swoop . . . . Then we sold a lot of things.  So we sold some cars and stopped some services.  My mother had just previously died, so I received some money on inheritance that immediately was soaked into attorney bills because we had a lawsuit to fight right away."); Smith Tr. 386 ("[I]t was humiliating and probably one of the hardest things I've had to go through.").

[19] Smith Tr. 392; *see also id.* ("I didn't have any guarantee of hours worked, just part time, whatever I could get to provide for my family.").

[20] PTO ¶ 28; *see* JX 601.

[21] PTO ¶¶ 32, 46.

Sussman (the "Derivative Action").[22] The Derivative Action asserted claims for legal malpractice and breach of fiduciary duties arising from Sussman's role in Morelli's removal from the board.[23] In June, the Court granted a stipulated order to voluntarily dismiss Sussman without prejudice for lack of subject matter jurisdiction, based on an arbitration provision in his engagement letter.[24]

The case against Sussman proceeded to arbitration. On August 30, 2016, the Derivative Action plaintiffs—Defendants here—filed derivative claims on Optimis's behalf against Sussman before JAMS (the "Arbitration").[25] Optimis was not a party to the Arbitration.[26] The arbitrator issued an "Interim Award" on April 29, 2019, and a "Final Award" on August 12.[27] On September 12, the arbitrator issued an "Amended Final Award" finding Sussman liable.[28] Defendants, as derivative claimants, secured $5,278,222.95 in compensatory damages, plus fees, costs, and pre- and post-judgment interest on behalf of Optimis (the "Award").[29]

---

[22] *Atkins, et al. v. Morelli, et al.*, C.A. No. 11581-VCZ, at D.I. 1 (Del. Ch. Oct. 7, 2015) [hereinafter "Deriv. Action"]; PTO ¶ 29; Arb. Award at 2.

[23] JX 11.

[24] PTO ¶ 30; Deriv. Action at D.I. 36.

[25] JX 14; PTO ¶ 31.

[26] Arb. Award at 5.

[27] *See* JX 74; JX 159.

[28] *See* Arb. Award.

[29] *Id.* at 84–86 (ordering the respondent to pay $5,278,222.95 in compensatory damages plus pre-judgment interest (7% per annum) and post-judgment interest (10% per annum) plus attorneys' fees ($1,435,107.90) plus costs ($436,550.35)).

On September 19, one week after the arbitrator issued the Amended Final Award, Defendants' counsel and Sussman's counsel agreed amongst themselves that in exchange for keeping the Arbitration confidential, Sussman would pay the award to the IOLTA account of Defendants' counsel Bayard, P.A. ("Bayard").[30] On October 31, the full Award was remitted to Bayard's escrow account.[31]

### B. Defendants Seek To Distribute The Award To Stockholders.

Upon learning of the Interim Award, Defendants believed "the best thing to do" was to distribute the proceeds to Optimis stockholders they deemed "innocent"—all Optimis stockholders "other than Morelli, Sussman, and the board members" entangled in the two lawsuits.[32] Those "innocent" stockholders included Defendants' close friends and family, who had poured substantial sums into the Company over the years.[33]

---

[30] JX 191.

[31] PTO ¶ 38.

[32] Waite Tr. 277–78; Atkins Tr. 342.

[33] *See* Waite Tr. 277 ("[T]he innocent shareholders included my father, who invested money. And my brother, and my other brother. And my neighbor, who's one of my best friends. And another very close friend of mine who invested a million dollars. And they all put their money into this. And this was an avenue to try to at least make them partially whole on their investment, try to get them something, some return."); Smith Tr. 389–90 ("We were hoping at some point in time to provide money back to some of the shareholders that invested into the company . . . . One of them was my mother, who invested in the company. And she is now 86, and she continues to ask if she'll ever be able to get some of her money back.").

Defendants did not trust the Morelli-controlled board to use the proceeds in the Company's best interests.[34] During their time at Optimis, Defendants believed "Morelli's management of funds was very counterintuitive."[35] In Atkins's words: "Even when we were with Rancho . . . making [$]300 to $350,000 a month sending it forward, [] he was still trying to borrow money."[36] He could not figure out why Morelli was not "spending money to develop physical therapy" or Optimis's software business.[37] Defendants believed the board was preoccupied with loans and legal fees, and would not use the proceeds to deliver value.[38]

More fundamentally, Defendants viewed the board as "complicit" in the events underlying the Arbitration.[39] In Defendants' eyes, Sussman, Morelli, and the rest of the board were on the same team: the Derivative Action underlying the Arbitration had been "against all of them."[40] Defendants did not believe it was in

---

[34] Waite Tr. 278; Atkins Tr. 343–44.

[35] Atkins Tr. 343; *see also* Plenary Op. at *29, *36 ("By spring 2012, many key employees had lost faith in Morelli's ability to manage the Company successfully . . . . Resource allocation issues were high on the list of concerns, and morale was low.").

[36] Atkins Tr. 343–44.

[37] *Id.* at 344.

[38] Waite Tr. 278; Atkins Tr. 344 ("[Y]ou know, the best predictor of future behavior is past behavior. So I thought that maybe he would be spending more money on legal things rather than on developing physical therapy and the software, which I still think is fantastic software at Optimis.").

[39] Waite Tr. 277–78; Atkins Tr. 340; Smith Tr. 388–89.

[40] Atkins Tr. 341; *see also* Smith Tr. 389.

the stockholders' best interests to hand over the Award to the few individuals who had "hurt[] Optimis so badly."[41]

After Defendants left Optimis on bad terms, they and their loved ones remain Optimis stockholders. Defendants testified they did not intend to harm Optimis in seeking to distribute the Award to "innocent" stockholders.[42] I believe them.

### C.    Optimis Struggles To Stay Afloat.

In the meantime, Optimis was "barely staying afloat."[43] The Company had not turned a profit since at least 2015.[44] Debt was piling up and getting more expensive, margins were lean, and "payroll was just barely able to pay everybody."[45] It was not uncommon for the Company to seek extensions on its clinics' rent payments.[46]

One side of the problem was the clinics. The clinics were a "mess."[47] Some suffered from a "culture" of "low productivity."[48] The MVP clinics in particular

---

[41] Atkins Tr. 340.

[42] *Id.* at 344; Waite Tr. 277–79; Smith Tr. 391.

[43] Price Tr. 24; *see also id.* at 106 (testifying that "[t]he Company has always been in a little bit of a tough financial situation"); Smith Tr. 416 ("They've always been in a tough financial position.").

[44] Price Tr. 102–03; Morelli Dep. 181–82 ("I don't think the company has been profitable since 2013.").

[45] JX 81 at 1; JX 169; Price Tr. 107.

[46] Price Tr. 107.

[47] JX 174; Price Tr. 112.

[48] Dourney Tr. 238.

9

lagged behind industry standards in terms of patient volume.[49] According to Optimis's then-COO Dan Dourney, industry norms call for approximately 1.5 patients per hour, or 12 patients in a typical eight-hour workday.[50] When Dourney joined Optimis in 2017, productivity ranged from "6 to 11 visits per day in most of the facilities."[51] He believed MVP's highest-paid physical therapists were "checked out."[52]

Some clinics had racked up "extraordinary expenses."[53] During his tenure, Dourney had catalogued approximately $750,000 worth of "questionable" expenses at the Beachside clinics.[54] Those expenses included a private jet for a golf trip in the Caribbean; tickets, flights, and hotels for the US Open; an iTunes account; rental dresses from Rent the Runway; a boat slip at a yacht club; and Publix groceries on demand.[55]

---

[49] *See id.* at 209, 229.

[50] *Id.* at 229.

[51] *Id.* at 229–30.

[52] *Id.* at 213.

[53] *Id.* at 232; *see also* JX 471.

[54] Dourney Tr. 234.

[55] *Id.* at 232–34.

Some clinics had trouble retaining and recruiting staff.[56] The physical therapy labor market is highly competitive and "transient."[57] Clinics across the country inevitably compete for the same patients, payors, and clinical staff.[58] Optimis's clinics were no exception.

Defendants rebuilt their careers at a competing Southern California-based physical therapy company, All Star Physical Therapy, Inc. ("All Star"). All Star, a Rancho competitor, grew its portfolio from just three clinics in 2013 to almost thirty in 2022.[59] Defendants sold All Star for $29,750,000 in 2021.[60] Nearly fifty Rancho employees followed Defendants to All Star over the years.[61] In 2017, Rancho's San

---

[56] *See, e.g.*, Price Tr. 19–20; JX 189 at 4 (September 19, 2019 Board meeting minutes stating: "For Rancho, in particular, we lost a significant number of therapists. There has been a great deal of noise being generated by 'All Star' in the marketplace."); JX 244; JX 315; JX 32 (April 2019 board presentation noting that "[s]taff turnover in two of our clinics led to combined losses of $200k").

[57] Waite Tr. 280–81; *see also* Price Tr. 20–21 ("[T]he PT market, from a staffing perspective, is extremely competitive and extremely limited. There's just not enough people graduating PT schools to make up for the loss in physical therapists that we are getting on a day-to-day basis."); Price Tr. 117 (confirming Washington state is a "very competitive region" because of its "high reimbursement rates").

[58] *See* Waite Tr. 280–81; Price Tr. 20–21, 117; Manning Tr. 172; Dourney Tr. 221, 234–35.

[59] Waite Tr. 291–92; JX 400.

[60] Waite Tr. 284–86; JX 400.

[61] JX 276 at 4 (estimating that "at least 48 Rancho employees left to join All Star"); Price Tr. 19–20; *see also* Waite Tr. 291–92.

11

Jacinto clinic was "los[t] to All Star in one fell swoop."[62]  The clinic had to restaff "everyone from the clinic director down."[63]

Optimis's MVP clinics also suffered from turnover and competition.  In 2017, MVP's former owner Patrick Garlock resigned due to disagreements with Optimis's management and joined RET, an MVP competitor.[64]  MVP's other former owner Mike Jennings followed in late 2019, as did a handful of MVP's clinical staff.[65]  In 2018, Beachside's former owner Steve Ryland also resigned due to disagreements with management and established his own physical therapy clinic in the area, Beach PT.[66]  Beachside subsequently lost referrals, patients, and revenue.[67]

The other cause of Optimis's problems was the cost of its poor financial condition.  Optimis had not received a traditional commercial loan since at least 2015.[68]  Traditional lenders and investors were not comfortable funding a company embroiled in litigation and struggling to stay afloat.[69]

---

[62] Manning Tr. 174.

[63] *Id.*

[64] JX 610 ¶ 7; *see also* JX 135.

[65] Price Tr. 20; JX 357.

[66] Dourney Tr. 212; Price Tr. 15.

[67] Dourney Tr. 235–36.

[68] Price Tr. 108.

[69] *See id.* at 38 ("Traditional loans and lenders . . . did not like our financial condition.  They did not like how . . . for the last three, four years, everything was trending down from a financial p[er]spective in clinical performance.  And also . . . the derivative litigation just

One of Optimis's main financing sources has been accounts receivable lending. Marble Bridge Funding Group, Inc. ("Marble Bridge") has been Optimis's accounts receivable lender since 2016.[70] Accounts receivable lending is not "typical debt financing."[71] It is a type of asset-based financing in which a business sells or borrows against its outstanding invoices to secure immediate cash flow. The lender purchases a portion of the borrower's outstanding accounts receivables on a regular basis "at a discounted 'expected collectible amount.'"[72] For example, if a borrower in the healthcare industry saw a hundred patients in one week, the lender would purchase a hundred patients' worth of invoices and advance a certain percentage of that amount—typically 70 to 80%—in cash.[73] That percentage reflects the lender's fee and a "reserve" amount designed to account for fluctuations in billing volume.[74]

Accounts receivables lending is one way for healthcare providers like Optimis to weather delays in receiving reimbursement payments from insurers, who can take

---

put a shadow over everything. It made it really difficult to get [] traditional lenders comfortable—even traditional investors comfortable in investing in the company."); Dourney Tr. 217 ("There's a long history of litigation with the Rancho group that when traditional lenders come in and look at that, they see what's already been mentioned, the litigation that goes on. So that kind of scares them off.").

[70] *See* JX 41; JX 65; JX 94 at 38 (stating that Optimis "entered into a Credit Agreement with Marble Bridge for up to $4.0 million line of credit in 2016"); JX 297.

[71] JX 470 at 15 n.43, 16 n.44.

[72] *Id.*

[73] Price Tr. 44–45.

[74] *Id.*

months to process invoices.[75] But the quick cash flow is not cheap: for every dollar Optimis bills, Marble Bridge provides approximately eighty cents.[76] And it places incoming payments in the lender's control: Marble Bridge could access each Optimis subsidiary's bank account and "sweep it clean" once reimbursement payments hit.[77] By the end of 2018, Optimis had drawn nearly $2 million in advances under its arrangement with Marble Bridge.[78]

By 2019, Optimis's financial condition was "[b]reakeven at best."[79] In the first quarter of 2019, Optimis's clinics lost a total of $1.2 million.[80] That loss was far greater than expected, even considering low visit volume at the beginning of the year.[81] Despite having completed a Series A equity raise in January, Optimis was struggling to make payroll.[82]

---

[75] *See id.* at 43–44 ("[T]he clinic bills Aetna for [] one visit. And it takes somewhere between 30 to 90 days for Aetna to process that bill and actually reimburse or pay the physical therapist for their service. And so unlike a goods business . . . you have to wait sometimes 90 days to get paid. Sometimes, if they are uninsured, you don't get paid at all. Or sometimes if there's issues with the insurance company, there's delays in that billing.").

[76] *Id.* at 163.

[77] *Id.* at 46; *see* JX 297 at 31.

[78] JX 94 at 38.

[79] Dourney Tr. 218.

[80] JX 81 at 1; *see also* Manning Tr. 178 (testifying that by early 2019, "the clinics had just continued to decline, and things were not getting better").

[81] JX 81 at 1.

[82] Manning Tr. 176–77; JX 81 at 1.

On May 3, Optimis's board of directors (the "Board") met to consider two sources of capital proposed by Optimis's finance committee (the "Finance Committee").[83] One option was to launch a Series A-1 preferred stock offering (the "Series A-1").[84] The proposed Series A-1 would be similar to the Series A offering that Optimis had closed in January, but with a higher valuation.[85] The "only other viable option" at the time was to take out short-term "hard money loans."[86] These hard money loans would carry an interest rate of over 30% "and typically would require daily remittance of repayment."[87] Optimis's general counsel and Finance Committee secretary Paul Price explained to the Board that hard money loans would not only be "extremely expensive," but would also "cause a disruption" with Marble Bridge.[88]

The Board opted to go with the Series A-1 and approved a round for up to $5 million.[89] Optimis thereafter increased the maximum offering amount to $8 million, based on the Finance Committee's determination that it would need more than $5

---

[83] *See* JX 81.

[84] *Id.* at 2–3.

[85] *Id.* at 2.

[86] *Id.* at 3.

[87] Price Tr. 40; JX 81 at 3.

[88] JX 81 at 3.

[89] *Id.*

million.[90]  Despite initial interest among a few investors, the Series A-1 never got off the ground.[91]  According to Optimis, one of its major stockholders did not want to be diluted.[92]  Optimis tabled the Series A-1, and leaned on Marble Bridge for another $6 million combined financing facility.[93]

By late summer, Optimis "forecasted that [it was] going to need a significant amount of working capital . . . to get through the end of the year."[94]  At a September 19, 2019 Board meeting, Optimis's CFO explained that "the clinics are having a really rough time so far this year."[95]  The minutes attributed the clinics' losses to All Star's "attacks" on Rancho.[96]

---

[90] JX 94 (draft confidential information memorandum dated May 15, 2019); Price Tr. 28–29 ("[T]he finance committee made a determination, through the help of our finance team, that we would probably need more capital along the lines of 8 rather than 5 million.").

[91] Price Tr. 29 ("[Morelli] and another investor, preferred stock round investor, were interested in putting roughly, I think, maybe 1.5 million in . . . . [And] we received some interest from a potential institutional company that wanted to put some money in.").

[92] *See* Dourney Tr. 218 ("Andrew Shannahan was a large shareholder and didn't want to be diluted."); Manning Tr. 188–89; Price Tr. 33; *see also* JX 189 at 5 (September 19, 2019 Board meeting minutes explaining that the Series A-1 was initially dismissed "based on concerns from stockholders that it would cause unnecessary dilution in light of the forthcoming $6 million arbitration award"); JX 224.

[93] *See* JX 297 at 30–36.

[94] Price Tr. 38.

[95] JX 189 at 3.

[96] *Id.* at 4–5.

16

Optimis believed it had no other choice but to take out short-term hard money loans "to bridge the Company until the arbitration award is issued."[97] Price told the Board about two offers he had secured, together providing $750,000 over eight months at a cost of approximately $250,000.[98] Both loans were approved by the Board and executed that same day.[99]

One was a $300,000 loan from Forward Financing LLC ("Forward Financing").[100] This loan required repayment of $399,000 in weekly installments of $12,468.75, and a $2,995 processing fee to be deducted from the loan principal.[101] Optimis would end up paying $111,469 in interest over 214 days, implying a 63% simple annual interest rate.[102] The other was a $450,000 loan from Fox Capital Group, Inc. ("Fox").[103] This loan required repayment of $598,500 in daily installments of $3,740.63, and a $4,500 underwriting fee to be deducted from the

---

[97] *Id.* at 5; *see also* Price Tr. 38 ("[A]t this point in time, we were getting pretty desperate, and the only options we had were hard money lenders.").

[98] JX 189 at 5.

[99] *Id.*

[100] JX 190.

[101] *Id.* at 3–4, 5 (providing that "Purchaser will deduct the amount of the Processing Fee from the Purchase Price"); *see* JX 196 at 1 (bank statement showing $297,005 deposited by Forward Financing on September 23, 2019).

[102] JX 470 at 17; JX 411, Ex. F.

[103] JX 188.

loan principal.[104] Optimis would end up paying $148,501 in interest over 219 days, implying a 55% simple annual interest rate.[105]

On October 15, the Finance Committee met to approve yet another loan.[106] The next day, Optimis took out a $500,000 loan from OneFunder LLC ("OneFunder").[107] This loan required repayment of $650,000 in daily installments of $5,652.20, and a $15,045 origination fee to be deducted from the loan principal.[108] Optimis would end up paying $94,712 in interest over 174 days, implying a 40% simple annual interest rate.[109]

### D. Bayard Receives The Award, And Rancho's Bank Accounts Are Levied.

On October 31, the Award was transferred to Bayard's escrow account in the amount of $8,675,794.[110] By then, Optimis was aware "it [was] likely to require a

---

[104] *Id.* at 2, 11 (providing that a 1% underwriting fee would be "paid out of the Purchase Price/funding amount"); JX 196 at 1 (bank statement showing $445,500 deposited by Fox on September 23, 2019).

[105] JX 470 at 17; JX 411, Ex. F.

[106] *See* JX 211 (October 15, 2019 Finance Committee meeting minutes reflecting approval of a $500,000 loan "to bridge the Company until the receipt of the arbitration award"); JX 210.

[107] JX 212.

[108] *Id.* at 3; *see* JX 226 (bank statement showing $484,920 deposited by OneFunder on October 17, 2019).

[109] JX 470 at 17; JX 411, Ex. F.

[110] PTO ¶ 38; JX 241 at 11 (confirming Bayard "received payment in the amount of $8,675,794.00 from Allen Sussman, in full satisfaction of the amended final award issued on September 12, 2019").

motion for [the Company] to expedite the receipt of the funds."[111] Optimis did not take any action at that time.

On November 13, Bayard sent Optimis's counsel a "Notice of Distribution" proposing that Defendants distribute the Award "on a *pro rata* basis, to those individuals and entities holding stock in Optimis*Corp* between September 21, 2012 and June 24, 2013, other than the Individual Defendants [in the Derivative Action] and any entities owned or controlled in whole or in part by any of them."[112] The Notice of Distribution also relayed Defendants' intent to distribute $2,471,773.10 to Bayard—$1,871,613.25 in attorneys' fees and costs per the arbitrator's ruling, and an additional $1,036,665.20 as a contingent fee.[113] Optimis's then-counsel responded by letter dated November 21 objecting to Defendants' proposed distribution.[114] The parties exchanged letters into December; Optimis's counsel maintained that "there is no basis under Delaware law for [Defendants] to withhold

---

[111] JX 605 at 1–2.

[112] JX 241 at 12.

[113] *Id.* at 11–12 ("Bayard is entitled 'to receive thirty percent (30%), net of expenses, of any gross recovery received by the [Claimants]' . . . . Bayard is therefore entitled, pursuant to the terms of the Engagement Letter, to a contingent fee at least in the amount of $2,471,773.10. Crediting the attorneys' fees awarded in the Arbitration, Bayard is owed an additional $1,036,665.20.").

[114] JX 246.

the Award proceeds which represent purely derivative recovery belonging solely to OptimisCorp."[115]

On November 22, a third-party debt collections agency executed a levy on Rancho's bank accounts to enforce the judgment in the Employment Action.[116] Atkins and Smith had previously assigned all rights, title, and interest in the judgment to the agency in May.[117]  As the assignee of record, the agency dictated when and how to collect on the judgment.[118]

The levy made Marble Bridge "extremely irate," as it could not collect on the invoices it had purchased from Optimis, and was going to have to hire an attorney to remove the levy.[119]  Optimis's then-counsel complained to Bayard that the combination of withholding the Award, and the levy, "is placing both Rancho and OptimisCorp in grave harm."[120]

---

[115] JX 264 at 4.

[116] PTO ¶ 39; JX 245.

[117] PTO ¶¶ 34–35; JX 96; JX 97.

[118] *See* JX 245 at 4 (listing "Creative Recovery Concepts, Inc." as "Judgment Creditor").

[119] Price Tr. 68–69; *see also id.* ("[T]echnically the money in those accounts belongs to them because they had already bought the billing.  And so the money in those accounts represents the reimbursement that insurance companies were paying us for 30, 90 days previous.  And so that money belonged to them."); Manning Tr. 180 ("[Marble Bridge was] pretty unhappy.  There were lots of phone calls during that time because they had already purchased the accounts receivable.  So they were overleveraged, essentially, at that point because they had already funded, but they weren't receiving the corresponding revenue."); JX 264 at 4 ("Rancho's accounts receivable purchaser is likely to commence its own steps to seek relief for the conversion of funds as they have been improperly levied.").

[120] JX 264 at 4.

### E. Optimis Takes Out More Short-Term Loans.

As the parties' lawyers sparred over the levy and the Award, Optimis scrambled for cash to survive what it documented as a "working capital crisis."[121] It concluded its only solution was emergency and expensive short-term loans. From November 2019 to March 2020, Optimis borrowed $7.5 million in numerous additional loans, at the cost of $1.2 million.[122]

1. On November 23, 2019, Optimis took out a $200,000 loan from Price's childhood friend, Andrew Kim.[123] This loan came with a 15% fee.[124] Optimis repaid a total of $230,000 just days later on December 3, implying a 782% simple annual interest rate.[125]

2. On December 2, 2019, Optimis took out a $1 million loan from Cherry Miyake, one of the Company's Series A investors.[126] This loan carried an interest rate of 8% until repayment and a $50,000 facility fee.[127] It also required the issuance of 250,000 warrants for Miyake to purchase shares of Optimis common stock, and a "strong personal guaranty from [Morelli] to

---

[121] *See, e.g.*, JX 244 (November 20, 2019 Finance Committee meeting minutes describing Optimis's "working capital crisis"); JX 261 (December 2, 2019 Finance Committee meeting minutes describing Optimis's "fiscal crisis").

[122] JX 470 at 15; JX 411, Ex. F. The parties stipulated to the amounts identified in Optimis's expert report, available at JX 470. *See* Trial Tr. 55.

[123] JX 247 at 2; Price Tr. 60. Due to issues in wiring the funds directly to Optimis's account, Kim wired $200,000 to Price's joint account with his wife, and Price immediately wired the funds to Optimis. Price Tr. 58–59. That is why the Company's November 2019 bank statement indicates the funds came from Price. JX 259 at 4.

[124] JX 247 at 2.

[125] JX 470 at 17; JX 411, Ex. F.

[126] JX 261; JX 260; Price Tr. 60.

[127] JX 261; JX 260.

secure repayment."[128]  Optimis repaid a total of $1,059,425 on January 16, 2020, implying a 48% simple annual interest rate.[129]

3.  On December 23, 2019, Optimis took out a $300,000 loan from Morelli.[130] Interest would accrue at 8% per annum.[131]  Because Morelli was mortgaging his home to extend this loan, Optimis agreed to provide 300% warrant coverage.[132]

4.  On January 7, 2020, Optimis took out another $300,000 from Kim.[133]  This loan carried a $45,000 facility and processing fee, and was secured by the Company's accounts receivables up to the principal amount.[134]  Optimis repaid a total of $345,000 on January 16, implying a 684% simple annual interest rate.[135]

5.  On January 9, 2020, Optimis took out a $2.4 million loan from Fulcrum Credit Partners ("Fulcrum").[136]  This loan came with a $400,000 fee, which would be deducted from the principal amount.[137]  Most of it went out the door almost

---

[128] *See* JX 261; JX 260 at 6–15.

[129] JX 315 at 5; JX 470 at 17; JX 411, Ex. F.

[130] JX 288; JX 291.  The loan was disbursed in the following installments: $130,000 on December 24; $80,000 on January 10, 2020; $31,000 on January 21; and $54,762 on February 10.  JX 470 at 16.

[131] JX 288; JX 291.

[132] JX 288; JX 291.

[133] JX 298; JX 299.

[134] JX 298; JX 299 at 2.

[135] JX 315 at 5; JX 470 at 17; JX 411, Ex. F.

[136] JX 361; *see* JX 314 at 1 (bank statement showing $2 million deposited by Fulcrum on January 14, 2020).  The January 30, 2020 Finance Committee meeting minutes state, contrary to the Company's January 2020 bank statement, "that Fulcrum funding has not come in yet."  JX 313 at 2.

[137] JX 361 at 2.

immediately to repay the Miyake and Kim loans.[138] Optimis repaid a total of $2.4 million by January 9, 2022, implying a 9.5% simple annual interest rate.

6. On January 21, 2020, Optimis took out another $100,000 loan from Kim.[139] This loan carried a $12,000 facility and processing fee, and was secured by the Company's accounts receivables up to the principal amount.[140] Optimis repaid a total of $112,000 a week later on January 28, implying a 730% simple annual interest rate.[141]

7. On February 4, 2020, Optimis took out another $400,000 loan from Kim.[142] This loan carried a $48,000 facility and processing fee, and was secured by the Company's accounts receivables up to the principal amount.[143] Kim also negotiated for a warrant to purchase 66,667 shares of Optimis common stock due to its "longer duration" relative to Kim's previous loans.[144] Optimis repaid a total of $449,000 two weeks later on February 20, implying a 298% simple annual interest rate.[145]

8. On February 6, 2020, Optimis took out another $1 million loan from Morelli.[146] This loan would require Morelli to refinance his home a second time and borrow $1.3 million.[147] The Finance Committee agreed to provide 300% warrant coverage and "a reimbursement of all points, fees and other

---

[138] JX 314 (bank statement showing $345,000 paid to Kim and $1,059,424.66 paid to Miyake on January 16, 2020); Price Tr. 83 ("And when we received 2 million working capital from Fulcrum, we basically paid Andrew back . . . and we paid Cherry Miyake back fully."); Price Tr. 84 ("[A] lot of th[e] [Fulcrum] money was already earmarked to repay Cherry Miyake . . . as well as [to take] care of some other loan repayments.").

[139] JX 303; JX 304.

[140] JX 303; JX 304.

[141] JX 315 at 7; JX 470 at 17; JX 411, Ex. F.

[142] JX 313 at 2; JX 316.

[143] JX 313 at 2; JX 316.

[144] JX 313 at 2; JX 316 at 3.

[145] JX 334 at 6; JX 470 at 17; JX 411, Ex. F.

[146] JX 313 at 2–3; JX 315 at 7–8; JX 317.

[147] JX 315 at 7; JX 317 at 1.

23

costs of refinancing the property."[148]   Optimis repaid Morelli a total of $1,641,000 on July 29, 2020, implying a 41% simple annual rate.[149]

9. On March 1, 2020, Optimis took out another $500,000 loan from Miyake.[150] This loan carried an 8% interest rate and a $25,000 facility fee.[151] Optimis repaid the $500,000 principal amount on May 5, 2020.[152] The record is silent as to whether it paid the finance fee or any interest.

### F.      COVID-19 Hits, And Clinics Close.

In March 2020, as COVID-19 gripped the world, Optimis's clinics "went dark."[153]   Washington was the site of the first major outbreak of COVID-19 in the United States.[154]  The city of Kirkland was "ground zero."[155]  MVP's Kirkland clinic closed its doors first; the rest of the MVP clinics followed suit by the end of the month.[156]  The Rancho clinics also took a hit.  As Price explained, "every single

---

[148] JX 315 at 7.

[149] JX 470 at 17; JX 411, Ex. F.  Optimis repaid both the December 23 loan and February 6 loan on the same day.  *See* JX 470 at 17 n.48.

[150] JX 337; JX 338.

[151] JX 337 at 1; JX 338.

[152] JX 362 at 2; JX 470 at 17.

[153] Manning Tr. 195.

[154] *See* Price Tr. 97–98; Manning Tr. 196.

[155] Price Tr. 97–98.

[156] *Id.* at 97–98, 110; JX 346 ("As conditions got worse last week, we followed the advice of regional director, Ron McNamara, to temporarily close all MVP clinics two days ago, with the hopes that we can reopen in 6-8 weeks.").

clinic [] experience[d] significant disruption secondary to COVID."[157]  In the months the clinics were dark, visit volumes plummeted, revenues suffered, and Optimis struggled to cover rent and make payroll.[158]

In June, Optimis received a $4 million Paycheck Protection Program ("PPP") loan.[159]  It received an additional $2 million PPP loan in or around the last quarter of 2020.[160]  All $6 million was forgiven.[161]  Still, a handful of clinics were never able to turn the lights back on.  Manning testified that it was "incredibly difficult" for MVP to recover from the impacts of COVID, and that "after March 2020, MVP patients began visiting other competing clinics."[162]  In total, five MVP clinics and two Rancho clinics shut down permanently in 2020.[163]

### G.    Optimis Pursues The Award.

In the meantime, Optimis came to this Court to chase the derivative arbitration Award that Defendants' counsel had escrowed.[164]  Defendants resisted, seeking delay

---

[157] JX 345; *see also* JX 343 ("The COVID situation is wrecking our clinics and AR."); JX 356 at 3 ("[T]he entire state is on lockdown and our clinics are taking a significant hit.  The future of our business lies in the balance of the COVID situation.").

[158] *See* JX 343; JX 345; JX 346; JX 356; Price Tr. 124, 126; Manning Tr. 195–97.

[159] Price Tr. 127.

[160] *Id.*

[161] *Id.* at 127–28.

[162] Manning Tr. 196.

[163] JX 470 at 20–21; Manning Tr. 183.

[164] Deriv. Action at D.I. 186, D.I. 187, D.I. 188; *see also* D.I. 1.

and a distribution of the Award to a subset of stockholders.[165] On June 18, 2020, Optimis secured a declaratory judgment that the Award was derivative and should be turned over to Optimis.[166]

On June 25, the parties filed a joint status report explaining that Defendants had not yet remitted the Award to Optimis.[167] Defendants asserted Optimis's request for return of the Award was tantamount to a "request for mandatory injunction," and claimed Optimis needed to move for mandatory injunctive relief.[168] In response, the Court reminded Defendants that its June 18 ruling "determined that the arbitration award at issue is derivative, is based on a purely derivative claim, and must be paid directly to Optimis, rather than a subset of individual shareholders."[169] The Court suggested that declaratory judgment should be adequate to compel return of the Award, as Defendants would surely comply without a redundant injunction.[170] On June 26, Defendants wired $5,211,789.70 of the Award to Optimis's counsel's escrow account.[171]

---

[165] D.I. 21.

[166] D.I. 45; D.I. 46; D.I. 69.

[167] D.I. 47.

[168] *Id.* at 4–5.

[169] D.I. 48 at 3.

[170] *Id.*

[171] D.I. 49; PTO ¶ 45.

The parties also disputed whether Optimis's counsel was entitled to a contingent fee over and above the fees awarded by the Arbitrator.[172] I denied Defendants' request for additional fees on July 15, 2021.[173] The same day, Defendants wired the remaining $1,606,954.41 of the Award to Optimis's counsel's escrow account.[174]

The fight over the Award spilled back into the Derivative Action. On July 19, Optimis moved to disqualify Defendants as derivative plaintiffs and to stay the Derivative Action pending this action.[175] The parties quarreled over the scope of the parties' arguments and discovery through the fall.[176] The Court stayed resolution of the motion to disqualify, and therefore the Derivative Action as a whole, pending resolution of this action.[177]

---

[172] D.I. 21 at Counterclaims ¶¶ 50–57; *OptimisCorp v. Atkins*, 2021 WL 2961482, at *3 (Del. Ch. July 15, 2021) ("Specifically, Defendants reasoned that because the[ir] Engagement Letter's thirty-percent contingency would entitle Bayard to $2,602,738.20 and because Bayard already had received $1,435,107.90 in attorneys' fees, Bayard should receive at least an additional $1,167,630.30 in attorneys' fees, subject to an upward adjustment if the Court determines Bayard is entitled to a success fee (the 'Additional Fees').").

[173] *OptimisCorp*, 2021 WL 2961482, at *12–14.

[174] PTO ¶ 47.

[175] Deriv. Action at D.I. 224.

[176] Deriv. Action at D.I. 236, D.I. 237, D.I. 244, D.I. 249, D.I. 253, D.I. 255, D.I. 256, D.I. 259, D.I. 260, D.I. 261, D.I. 264.

[177] Deriv. Action at D.I. 266, D.I. 267.

This action advanced through discovery to summary judgment. On June 1, 2023, I granted Defendants' motion as to Optimis's unjust enrichment claim.[178] I denied Defendants' motion as to Optimis's breach of fiduciary duty claim and entered *sua sponte* summary judgment in Optimis's favor on the question of liability.[179] I declined to rule on any damages until after trial, which was scheduled for July 5 through 7, 2023.[180] Optimis sought a continuance,[181] and trial was held from April 17 through 19, 2024.[182] Post-trial briefing was complete as of February 7, 2025,[183] but the parties did not schedule post-trial argument until October 3.[184] This post-trial opinion awards Optimis nominal damages.

## II. ANALYSIS

On summary judgment, I entered judgment for Optimis on the grounds that Defendants owed fiduciary duties as agents of the Company, and breached those duties in connection with the Award.[185] That conclusion was based on "the

---

[178] *OptimisCorp v. Atkins*, 2023 WL 3745306, at *24–25 (Del. Ch. June 1, 2023) [hereinafter "Summ. J. Op."].

[179] Summ. J. Op. at *16, 26.

[180] *Id.* at *24 ("Plaintiff raised disputes of material fact regarding the amount of damages. Issues in that regard [] require further development at trial. Consequently, I decline to rule on any damages associated with Count II on this Motion.").

[181] D.I. 215.

[182] D.I. 233.

[183] D.I. 239; D.I. 241; D.I. 245.

[184] D.I. 256; D.I. 257 [hereinafter "Hr'g Tr."].

[185] Summ. J. Op. at *9–24.

28

undisputed facts under a simple negligence standard and an agent's duties of loyalty."[186] What remains to be resolved is Optimis's entitlement to damages for any losses flowing from that breach. Optimis bears the burden of proving those damages by a preponderance of the evidence.[187]

"An agent's breach [of fiduciary duty] subjects the agent to liability for loss that the breach causes the principal."[188] Optimis's burden to prove its requested damages included the burden to prove a proximate "causal linkage exists between the breach of duty and the remedy sought."[189] "Delaware recognizes the traditional 'but for' definition of proximate causation"[190]—i.e., a "direct cause without which

---

[186] *Id*. at \*16.

[187] *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at \*10 (Del. Ch. Oct. 27, 2015).

[188] Restatement (Third) of Agency § 8.01 cmt. d(1) (A.L.I. 2006) (citing Restatement (Second) of Torts § 874 (A.L.I. 1979)); *see also id.* cmt. b ("Tort law subjects the agent to liability to the principal for harm resulting from the breach." (citing Restatement (Second) of Torts § 874 (A.L.I. 1979)).

[189] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859 (Del. Ch. 2022) (citing *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773, 775 (Del. 2006)); *see also* Restatement (Second) of Torts § 454 cmt. b (A.L.I. 1979) ("The same rules which determine whether the actor's conduct is or is not a legal cause of another's harm are applicable irrespective of whether the relation of legal cause and effect is necessary to establish liability or to establish the amount of damages to be paid where liability is admitted or proved."); *Medek v. Medek*, 2009 WL 2005365, at \*12 (Del. Ch. July 1, 2009) ("[A] plaintiff must demonstrate that the defendant caused the injury and present a reasonable and factually supported basis for determining damages." (citations omitted)); *J.P. Morgan*, 906 A.2d at 773 (noting that the "fundamental principle governing entitlement to compensatory damages" is that "the damages must be logically and reasonably related to the harm or injury for which compensation is being awarded" (citations omitted)).

[190] *Duphily v. Del. Elec. Co-op., Inc.*, 662 A.2d 821, 828 (Del. 1995).

the [injury] would not have occurred."[191] "Although there may be more than one proximate cause of [the] plaintiff's injury, 'our time-honored definition of proximate cause' has been the 'but for' rule."[192]

On summary judgment, I concluded Optimis had sufficiently shown the fact of damages to sustain a finding of liability: "Defendants' breaches of their duty of care caused damage to Optimis. The nine-month delay in receiving the bulk of the Award proximately injured Optimis by depriving them of an asset to which they had a right."[193] On the amount of damages, Optimis is correct that "Delaware does not 'require certainty in the award of damages where a wrong has been proven and injury established.'"[194] "Responsible estimates of damages that lack mathematical certainty are permissible so long as the court has a basis to make such a responsible

---

[191] *Chudnofsky v. Edwards,* 208 A.2d 516, 518 (Del. 1965).

[192] *Russell v. K-Mart Corp.*, 761 A.2d 1, 5 (Del. 2000) (citing *Duphily*, 662 A.2d at 828–29).

[193] Summ. J. Op. at *21.

[194] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002)), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *see also Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 466 (Del. Ch. 2011) ("[O]nce a breach of duty of loyalty is established, uncertainties in awarding damages are generally resolved against the wrongdoer." (citation omitted)); *see also Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) ("Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly.").

estimate."[195]  But speculation and conjecture are insufficient.[196]  While "damages resulting from a breach of fiduciary duty are liberally calculated, the trial court cannot substitute its best guess at harm for actual evidence of harm."[197]

This Court "cannot create what does not exist in the evidentiary record, and cannot reach beyond that record when it finds the evidence lacking.  Equity is not a license to make stuff up."[198]  Optimis has "failed to prove a causal link between its claimed damages and the proven breaches of fiduciary duty."[199]

### A.    Optimis Is Entitled To Nominal Damages.

Optimis seeks over $12 million in damages from a nine-month delay in receiving the Award.  It contends the one-two punch of that delay and the levy on Rancho's accounts drove Optimis to close clinics and and incur expensive short-term debt.  For the clinics, Optimis seeks lost business value damages, representing the going concern value of seven clinics that permanently closed in 2020.[200]  For the

---

[195] *Beard Rsch.*, 8 A.3d at 613 (citing *Del. Express Shuttle*, 2002 WL 31458243, at *15).

[196] *See id.* ("[T]his Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails to adequately prove damages." (quoting *Medek*, 2009 WL 2005365, at *12 n.78)).

[197] *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2582967, at *18 (Del. Ch. June 23, 2021) (internal quotation marks and citations omitted).

[198] *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *2 (Del. Ch. Mar. 21, 2018), *aff'd*, 210 A.3d 705 (Del. 2019).

[199] *Macrophage Therapeutics*, 2021 WL 2582967, at *19.

[200] JX 470 at 19–22.

debt, Optimis seeks the costs incurred as a result of "the Company's need for alternative debt financing in lieu of the Award."[201]

To support the requested damages, Optimis grabs at conduct, events, and actors predating, and exogenous to, Defendants' breach. It aggregates losses allegedly stemming from a broad "years-long scheme to dismantle and loot Optimis's clinics, which began while Defendants were serving as board members and executives of Optimis."[202] Everything that went wrong with Optimis's clinics and finances since at least 2013, Optimis blames on Defendants: not just from the withheld Award, but also from the levy and competition for staff.[203]

Optimis's saga begins in 2013, when Defendants allegedly conspired with MVP's former owners to "take control of Optimis" and "drive Optimis into bankruptcy" by soliciting its employees and assets.[204] Optimis's management testified repeatedly at trial about "attacks on Rancho" by All Star and a similar "playbook" at MVP.[205] Price testified that when Defendants "left [Rancho] to go to All Star" in 2013, they solicited payor contracts, referrals, landlords, and nearly fifty

---

[201] *Id.* at 7, 8–18.

[202] PRB 1.

[203] *See id.* at 11.

[204] POB 36, 42–44.

[205] Price Tr. 19–20, 35.

employees through "unfair" competition.[206]   Manning added that Rancho's San

Jacinto clinic was "los[t] to All Star in one fell swoop" in November 2017.[207]   As

for MVP, Dourney testified that dissatisfaction with Optimis's management led its

founders to "check[] out" of their roles and tank the MVP clinics' productivity.[208]

By 2019, both had left to join a competitor.[209]   Optimis's expert quantified losses

caused by this broader scheme, not the missing Award, relying on Board meeting

minutes that attribute Optimis's pain to "extensive attacks from the former owners"

and do not mention the Award a single time.[210]

The breadth of Optimis's theory has two consequences for damages.  First, it

cuts against the notion that the missing Award caused all that harm: by Optimis's

own account, and on the record before me, the claimed losses are attributable to cash

and staffing constraints that had nothing to do with the Award.  Optimis has not

---

[206] *Id.* at 23–24; *see also id.* at 35 ("The patient volume that we were getting was from extremely low-paying payors, as All Star was taking and undercutting our higher-end payors."); *id.* at 91 ("[T]here were even situations where All Star was offering special incentives . . . if the employee was actually coming from Rancho."); Manning Tr. 175 ("There were a couple of times where we weren't allowed to renegotiate our lease; they would just end our lease.  And All Star would take it over.").

[207] Manning Tr. 174.

[208] Dourney Tr. 213, 215; *see also* JX 174 at 1 (September 14, 2019 email from Morelli stating that "Pat [Garlock] and Mike [Jennings] are trying to implode MVP from within, and Boris and RET have been poaching our peeps, apparently with assistance from your boy Mike [Jennings]").

[209] JX 357; Price Tr. 53.

[210] JX 315; *see* JX 470 at 19 (citing JX 276); *id.* at 20 (citing JX 315).

33

proven Defendants caused the levy wrongfully, or at all; liability for the levy is not at issue in this case. Nor did this case address any decade-long scheme by Defendants.[211] I found Defendants liable for breach only in connection with withholding the Award.[212]

Second, Optimis's sweeping theory forecloses a "responsible estimate" of damages.[213] Optimis "has given me no way to separate the actual harm to the Company" flowing directly from Defendants' withholding of the Award.[214]

Optimis has not proven that withholding the Award caused the damages it seeks, or any lesser quantum. Optimis did not prove a "sufficient causal connection

---

[211] Optimis sued Defendants in this Court in 2013, asserting a series of claims tied to a similar theory—that "everything that has gone wrong at Optimis since at least 2012 is Defendants' fault." *See* Plenary Op. at *56. Optimis sought over $50 million in damages resulting from, among other things, Defendants' alleged conspiracy to "sabotage the Company's strategic plan; attempt to gain control of Optimis by ambush; [and] try to steal Rancho." *Id.* The case went to trial. Vice Chancellor Parsons concluded that most of Optimis's claims failed, and that Optimis was not entitled to any relief. *Id.* at *80–83. Optimis also sued MVP's founders in 2021 in the United States District Court for the Western District of Washington alleging, among other things, that they "breached the[ir] fiduciary duties through their participation in the scheme to bankrupt MVP and OptimisCorp." JX 607 ¶ 97.

[212] Summ. J. Op. at *24 ("Defendants exceeded their authority as derivative plaintiffs by purporting to manage a monetized derivative award, and breached their duty of care. It is also undisputed that Defendants withheld the Award to distribute it . . . to the exclusion of Optimis stockholders Defendants did not deem 'innocent.' Defendants breached their duty of loyalty.").

[213] *Beard Rsch.*, 8 A.3d at 613.

[214] *CSH Theatres, L.L.C. v. Nederlander of San Francisco Assocs.*, 2018 WL 3646817, at *29 (Del. Ch. July 31, 2018), *aff'd in part, rev'd in part on other grounds sub nom. In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39 (Del. 2019).

exists" between the missing Award and the damages Optimis seeks.[215] "Because there is no proven harm, there is no basis to award compensatory damages."[216]

### 1. Lost Business Value Damages

Optimis seeks between $7,629,656 and $10,096,744 in lost business value damages, representing the going concern value of the seven closed clinics.[217] It argues if the Company had timely received the Award, it would have been adequately capitalized; and if it had been adequately capitalized, it could have retained staff and emerged from the pandemic unscathed; and if it had done that, it would have sold the clinics for a profit instead of shutting them down. Optimis's expert Gregory Cowhey quantified what Optimis would have received in those sales by multiplying the clinics' 2019 revenues by revenue multiples derived from an investment bank's analysis of "small-scale multi-clinic transactions completed by U.S. Physical Therapy, Inc. ('USPH')" in or around 2021.[218]

Running its theory in reverse, Optimis needed to prove that the closures were caused by lost staff; that the staff left or were let go because Optimis was undercapitalized; and that Optimis would have been adequately capitalized if it had

---

[215] *Metro Storage*, 275 A.3d at 862.

[216] *Macrophage Therapeutics*, 2021 WL 2582967, at *18 (citations omitted).

[217] JX 470 at 19–22.

[218] *Id.* at 21, App'x F; Cowhey Tr. 445 ("[W]e were asked to calculate what would the value of these operations be that were shuttered if the Court concludes that they had an alternative strategy to sell these and receive money on the sale of these facilities.").

timely received the Award. That causal chain is contradicted by Optimis's own financial and payroll records, and the story it told at trial.

The evidence showed the closed clinics' finances were not harmed by a staffing shortage while the Award was missing. Defendants' rebuttal expert Brett Margolin demonstrated that convincingly. He analyzed each closed clinic's financials and payroll data between January 2019 and March 2020,[219] and made the following observations:

- **Palm Desert (Rancho)**: November 2019 posted the highest EBITDA margin in the thirteen-month period ending January 2020. January 2020 revenues closely approximately January 2019 revenues. Payroll from November 2019 through February 2020 largely remained consistent with the prior ten months.

- **San Jacinto (Rancho)**: January and February 2020 saw the third and seventh highest revenues, and the second and fifth highest EBITDA margins in the fourteen-month period ending February 2020. While it lost all clinical staff in September, before Defendants' breach, the clinic was successfully restaffed to pre-September levels by December, after the breach. No physical therapists left between November 2019 and June 2020.[220]

- **Bremerton (MVP)**: The Bremerton clinic was MVP's "highest-profit clinic."[221] But starting in June 2019, its revenue and EBITDA margins began a steady decline.[222] At the same time, payroll increased and peaked in January 2020. In other words, the clinic became overstaffed after Defendants' breach.[223]

---

[219] JX 411 at 14–21, Ex. C, Ex. E1–E7.

[220] JX 357.

[221] Margolin Tr. 582.

[222] *Id.*

[223] *Id.*

- **Kirkland (MVP)**: The Kirkland clinic realized higher revenues in January 2020 than in January 2019.[224] January and February 2020 posted the third and fourth highest EBITDA margins in the fourteen-month period ending February 2020. And payroll during that period remained consistent from prior months.

- **Lakewood (MVP)**: Revenues experienced steady, steep declines from April 2019 through January 2020. EBITDA margins were consistently negative from June 2019 onward. While the clinic experienced staffing shortages through September 2019, payroll shot up in October; November through January 2020 had the third, fourth, and fifth highest payroll in the fifteen-month period ending March 2020.

- **Port Orchard (MVP)**: December 2019 saw the highest revenue and the second-highest EBITDA margin in the fourteen-month period ending February 2020. November 2019 through January 2020 posted the highest payroll, and there were no employee departures from November 2019 through June 2020.[225]

- **Starfire (MVP)**: October and November 2019 revenues were higher than the clinic's September revenues. November 2019 through January 2020 posted the highest payroll during the thirteen-month period ending January 2020. Revenues and payroll plummeted only after Jennings, MVP's then-COO and the face of the Starfire clinic, left the Company.[226]

Overall, the closed clinics' performance and payroll during the relevant time period were consistent with, and in some cases better than, the ten months before Defendants' breach.[227] Optimis had internally benchmarked labor costs at 60% of

---

[224] *See* JX 398 (showing total revenues of $25,757.31 in January 2019 and $26,938.73 in January 2020).

[225] *See* JX 357.

[226] JX 411 at 23–27.

[227] *Id.* at 21.

revenue.[228]  At six of the seven closed clinics, payroll consistently exceeded that 60% benchmark: those clinics were overstaffed, not understaffed, while Defendants withheld the Award.  At the remaining clinic, payroll had consistently remained under 60% since April 2019.

Optimis also failed to acknowledge other obvious causes for the closures.  The most glaring was COVID-19.[229]  Optimis's expert does not mention COVID-19 at all: a remarkable omission for businesses at the epicenter of North America's COVID-19 outbreak that are reliant on in-person visitors, and that closed within weeks of cases being reported.[230]  And the record makes plain that the pandemic substantially contributed to the clinic closures.  When COVID-19 required clinics to temporarily close, "there were several months where there was no patient care at all."[231]  For clinics that managed to remain open or reopen at some point during the pandemic, a single staff member's exposure to COVID-19 "could wipe out an entire clinic for a week."[232]  Price acknowledged COVID-19 was a "major factor in the

---

[228] *See* JX 272 at 3.

[229] DAB 19–23, 50–51.

[230] *See* Price Tr. 97–98; Manning Tr. 195–96; JX 346.

[231] Manning Tr. 196.

[232] Manning Tr. 197.

decline" in both visit and patient volume.[233]  So did Optimis's COO.[234]  And so did Morelli.[235]

Staffing problems had other causes as well.  Price testified at trial that he believed Optimis "wouldn't have lost any staff" if it were adequately capitalized.[236] But he also testified that the Company had "lost quite a few physical therapists countrywide during COVID because they decided to . . . follow [their] passion."[237] Dourney likewise testified that 22,000 physical therapists left the profession during the pandemic.[238]  That evidence suggests at least some of Optimis's staff departures had nothing to do with capital constraints from the missing Award.

At bottom, Optimis argues the Award would have positioned the Company to weather Defendants' "attacks" on its clinics and emerge from the pandemic unscathed.[239]  That argument is far too speculative to support a damages award.  And the preponderance of the credible evidence suggests otherwise.  By March 2020,

---

[233] Price Tr. 124, 126.

[234] Manning Tr. 197 (confirming that "Rancho's business trended downward in March of 2020 . . . primarily [because of] COVID").

[235] *See* Price Tr. 126 (confirming that Morelli's estimate of a 20% to 25% COVID-related impact on clinic revenue in Southern California was "fair").

[236] *Id.* at 96.

[237] *Id.* at 21.

[238] Dourney Tr. 221; *see also* Waite Tr. 280.

[239] *See* Hr'g Tr. 9; PRB 27 ("Having an influx of $6.8 million at the start of COVID would have given the[] clinics a competitive edge over other competitors in the region, including All Star, allowing them to prosper during the pandemic.").

Optimis had obtained a total of $7.5 million in debt financing;[240] by July, Optimis had received $5.2 million of the Award;[241] and by the end of the year, Optimis had received $6 million in PPP loans, which were forgiven.[242] It still could not avoid the closures. If the missing Award played any role at all in Optimis's harm, it is that the closed clinics may have survived a little longer. But Optimis has not offered any nonspeculative basis for the Court to quantify that harm. Optimis is not entitled to lost business value damages.

## 2. Debt Damages

Optimis seeks $2,281,692 in debt damages "resulting from the Company's need for alternative capital, in lieu of the Award."[243] Its expert divided the debt damages into three phases. Phase One comprises $1,623,759 in fees, interest, and charges incurred between October 31, 2019, when Bayard received the Award, and June 26, 2020, when Optimis received $5,211,789.70 of the Award. Phase Two comprises $303,394 in fees, interest, and charges incurred in connection with Marble

---

[240] *See* JX 470 at 15–17. Margolin also pointed out the inherent contradiction in requesting both lost business value damages and debt damages, calling the two categories "mutually exclusive." JX 411 at 35. In requesting the former, Optimis claims Defendants' breach stripped the Company of cash to compete. In requesting the latter, Optimis claims it got the cash it needed by borrowing. So, having borrowed the money it purportedly needed, "Optimis mitigated the former." *Id.* at 36; Margolin Tr. 535.

[241] PTO ¶ 45.

[242] Price Tr. 127–28.

[243] JX 470 at 15–17.

Bridge funding between June 27, 2020, and July 15, 2021, when Optimis received the remainder of the Award. Phase Three comprises $354,539 in fees, interest, and charges incurred in connection with Marble Bridge funding after July 15, 2021.

### a. Phase One

The Phase One debt damages represent the cost of taking out thirteen short-term loans from Forward Financing, Fox, OneFunder, Kim, Miyake, Morelli, and Fulcrum, and factoring receivables through Marble Bridge until June 26, 2020.[244]

Some of the fees identified must be excluded off the bat. The Phase One debt damages analysis includes three fees Optimis paid on September 23 and October 17, before Bayard received the Award.[245] Optimis is not entitled to recover those fees because their payment predated the breach.[246] The analysis also includes a $25,000 finance fee charged by Miyake.[247] But the record does not show that fee was ever

---

[244] JX 470 at 15–17.

[245] *Id.* at 16; JX 190 at 5 (providing that the $2,995 processing fee would be "deduct[ed] . . . from the Purchase Price that is to be paid" to Optimis); JX 188 at 11 (providing that a 1% underwriting fee would be "paid out of the Purchase Price/funding amount"); JX 212 at 3 (providing that the $15,045 origination fee would be "deducted from the Purchase Price").

[246] Cowhey appeared to have recognized this, given he subtracted interest payments made before October 31 from the total Phase One debt damages. *See* JX 470 at 17 (subtracting $62,344 in interest payments made on the Forward Financing loan; $112,219 in interest payments made on the Fox loan; and $63,339 in interest payments made on the OneFunder loan). It is unclear why Cowhey's analysis includes pre-breach fees, but excludes pre-breach interest payments made on those same loans.

[247] *Id.* at 17.

paid, and it seems it was not: Cowhey writes that "[b]ased on discussions with Optimis'[s] management, Ms. Miyake's finance fee was not paid to her upon the loan principal repayment on May 5, 2020; although, Optimis has accrued on its balance sheet the finance fee."[248]

On a more fundamental level, Optimis has not demonstrated Defendants' breach caused its Phase One borrowing. Optimis's theory assumes a timely receipt of the Award would have eliminated the need to borrow at the level it did, or at all. When asked about the factual bases for that assumption, Cowhey responded that "by inference, I don't think people borrow money . . . unless [there is] a need for it."[249] That abstract inference falls far short of proving Defendants' breach created the need to take out the Phase One loans.

By 2015, Optimis was already struggling to obtain "traditional financing."[250] With limited access to equity financing,[251] Optimis turned to "expensive" accounts receivable lending through Marble Bridge and other sources of debt by 2016.[252] By September 2019, Optimis had amassed $21.7 million in outstanding debt, mostly in

---

[248] *Id.* at 17 n.50.

[249] Cowhey Tr. 488.

[250] Price Tr. 108; *see also id.* at 38, 69; Dourney Tr. 217.

[251] Price Tr. 38 (testifying that it was "really difficult to get . . . traditional investors comfortable in investing in the company").

[252] *Id.* at 163.

short-term instruments.[253] The cost of that debt grew year over year. As Margolin's rebuttal report explains, from 2016 to 2018, Optimis's interest rates went from those typically applied to short-term commercial loans for creditworthy customers, then to those consistent with "junk" and "speculative" grade debt, and then to those consistent with the "worst rated public debt."[254] Put another way, Optimis entered 2019 already heavily leveraged and constrained to the most expensive corners of the debt markets. By the time the Award was issued, Optimis was borrowing to keep up with its borrowing.[255]

Optimis repeatedly papered its Phase One debt as necessary to bridge the Company's "working capital crisis,"[256] and labeled the loans "working capital

---

[253] JX 169 at 2; JX 411 at 40.

[254] Margolin Tr. 543; JX 411 at 42.

[255] *See* JX 411 at 41 (explaining that Optimis was borrowing "primarily to service prior debt"); *see also* JX 189 at 3 (September 19, 2019 Board meeting minutes stating the Company's "significant" losses during the first eight months of the year are attributable to "the high interest rates to be paid").

[256] *See, e.g.*, *id.* at 5 (September 19, 2019 Board meeting minutes stating: "Mr. Price told the Board we don't have any other choice but to borrow funds from so called 'hard money lenders' to obtain necessary interim working capital."); JX 244 at 2 (November 20, 2019 Finance Committee meeting minutes stating: "Mr. Camp expressed some concern about the high interest rate, however, he acknowledged that there were no better options available to the Company" given "the need for lots of capital."); JX 276 at 6 (December 12, 2019 Board meeting minutes stating: "The Finance Committee provided an extensive update on the background of the efforts to obtain working capital and explained to the Board that the loan by Fulcrum was approved . . . in the amount of $2MM (as a principal) with an effective cost of 20%.").

loans."[257]   But Margolin calculated the Company's monthly cash burn to be approximately $240,000, which implies operating and "working capital" needs of $2.9 million per year.[258]   Optimis's actual Phase One borrowing far exceeded those baseline liquidity needs.  Over just six months, Optimis incurred $7.5 million in total loan principal, with as much as $4.5 million outstanding in February—on top of weekly accounts receivable funding from Marble Bridge.[259]   The excess was not to provide additional "working capital."[260]   It was to keep up with a "debt death spiral" that began before the Award was issued.[261]

Optimis insists its preexisting financial condition is irrelevant.  It invokes the "eggshell skull" rule, asserting "the defendant [must] take the plaintiff as he finds him."[262]   The eggshell skull rule is, as Optimis says, "a longstanding principle of Delaware tort law."[263]   But that "rule does not excuse [Optimis] from having to

---

[257] *See, e.g.*, JX 291 (executed "working capital loan" term sheet with Morelli); JX 299 (executed "working capital loan" term sheet with Kim); JX 304 (executed "working capital loan" term sheet with Kim); JX 316 (executed "working capital loan" term sheet with Kim).

[258] JX 411 at 41.

[259] *Id.* at 41 & n.39.

[260] Cowhey's Phase One debt damages analysis did not address Optimis's monthly cash burn, or how Optimis spent the proceeds of the Phase One loans.  *See* Cowhey Tr. 479–80, 487–88.

[261] Margolin Tr. 545.

[262] PRB 17 (quoting *Lipscomb v. Diamiani*, 226 A.2d 914, 918 (Del. Super. 1967)).

[263] *Reese v. Home Budget Ctr.*, 619 A.2d 907, 910 n.1 (Del. 1992).

present evidence that [its] damages were proximately caused by the [breach]."[264]

And it does not require Defendants to answer for the consequences of Optimis's past business decisions.[265] Those decisions included foregoing an $8 million Series A-1 equity raise in May and again in September 2019, despite recognizing that a debt raise "would have been too expensive and would have wasted too much money."[266] Optimis has not shown it needed to take on expensive debt because the Award was missing. The preponderance of the evidence shows it needed to take on expensive debt to pay off expensive debt.

In short, Optimis has failed to prove a sufficient and nonspeculative "causal linkage" between Defendants' breach and the Phase One debt damages.[267] The preponderance of the credible evidence does not show Defendants' withholding of

---

[264] *Johnson v. Gov't Empls. Ins. Co.*, 2014 WL 2708300, at *3 (D. Del. June 16, 2014).

[265] As Defendants point out, Optimis has not cited to any authorities expanding the rule's application from an individual's preexisting physical or mental conditions to a company's preexisting financial vulnerabilities. The eggshell skull rule traditionally subjects a tortfeasor "to liability for harm to another although a *physical* condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor . . . should have foreseen as a probable result of his conduct." Restatement (Second) Torts § 461 (A.L.I. 1979) (emphasis added). Optimis's authorities, which involve workers' compensation and personal injury claims, are consistent with that traditional framing. *See Reese*, 619 A.2d at 910; *Lipscomb*, 226 A.2d at 918.

[266] Price Tr. 27; *see* JX 189 at 1 (September 19, 2019 Board meeting minutes explaining that the Series A-1 was initially dismissed "based on concerns from stockholders that it would cause unnecessary dilution"); Dourney Tr. 218 ("Andrew Shannahan was a large shareholder and didn't want to be diluted."); Manning Tr. 188–89; JX 224.

[267] *Metro Storage*, 275 A.3d at 859.

the Award created any "working capital crisis," or a need to borrow that was not already there. While the withheld Award may have added borrowing pressures at the margins, Optimis has offered no reliable method to quantify that effect.

### b.  Phase Two And Phase Three

The Phase Two and Phase Three debt damages represent $657,933 in fees and costs associated with continued reliance on Marble Bridge from June 27, 2020, onward.[268] Optimis claims the interest and fees incurred in Phase One required the Company to seek additional financing from Marble Bridge.[269] Optimis is not entitled to recover those costs.

First, Optimis has not shown its continued reliance on Marble Bridge after receiving the lion's share of the Award was caused by Defendants' breach. Marble Bridge was the Company's long-time accounts receivable lender since 2016.[270] Optimis had relied on accounts receivable lending even before that.[271] Optimis offers no evidence that, absent the breach, it would have exited that relationship or ceased to rely on accounts receivables lending as a working capital source. And it offers no evidence that, because of the breach, it relied on Marble Bridge on worse

---

[268] JX 470 at 18, Ex. 5, Ex. 6.

[269] POB 48.

[270] *See* JX 41; JX 65; JX 94 at 38; JX 297.

[271] Price Tr. 43 (testifying that Optimis had "switched from another AR lender before" Marble Bridge).

terms or more than it did before. Defendants did not cause Optimis to continue drawing on a preexisting credit facility.

Alternatively, Optimis has not shown why or whether post-Award Marble Bridge funding was necessary at all. Optimis had repaid several of its Phase One loans before Phase Two.[272] And by Phase Three, Optimis had received the full Award along with $6 million in PPP loans.[273] It appears Optimis may have needed to seek additional debt financing to navigate declines in clinical performance coming out of the pandemic. Defendants did not cause the harm attributable to those exogenous factors.

### 3. Nominal Damages

"In the absence of sufficient proof of a specific injury, the court will issue a declaration that the defendant breached his fiduciary duties and award nominal damages."[274] "Nominal damages are not given as an equivalent for the wrong, but

---

[272] *See* JX 470 at 17.

[273] PTO ¶¶ 45, 47; Price Tr. 127–28.

[274] *Macrophage Therapeutics*, 2021 WL 2582967, at *19 (citations omitted); *see, e.g.*, *Lake Treasure Hldgs., Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *13 (Del. Ch. Oct. 10, 2014) ("Because the plaintiffs failed to provide a basis for a responsible estimate of damages reasonably related to their injuries from the breach of fiduciary duties, this decision awards nominal damages of $1.00."); *CSH Theatres*, 2018 WL 3646817, at *30 ("Any attempt by the Court to determine the harm caused by these actions would be entirely speculative conjecture, and thus, I award only nominal damages for the breaches of fiduciary duty."); *Ravenswood*, 2018 WL 1410860, at *25 (awarding nominal damages where the Court "found a breach of the duty of loyalty but [was] unable to award any other form of relief").

47

rather merely in recognition of a technical injury and by way of declaring the rights of the plaintiff."[275] Optimis "failed to prove anything more than nominal damages resulting from [Defendants'] fiduciary duty breaches."[276] Defendants are liable to Optimis in the amount of $1.00 for breaching their fiduciary duties as agents of the Company.

## B. Optimis Is Entitled To Costs, But Not Attorneys' Fees.

"Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs."[277] "Delaware courts grant exceptions to the rule cautiously."[278] One recognized exception lies where "a fiduciary has engaged in an 'egregious breach of the duty of loyalty,' but the harm flowing from the breach was 'not readily capable of quantification.'"[279] Another lies where a party has acted in bad faith.[280]

---

[275] *Oliver v. Boston Univ.*, 2006 WL 1064169, at *34 (Del. Ch. Apr. 14, 2006) (quoting *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *15 (Del. Ch. Dec. 15, 2005)).

[276] *Macrophage Therapeutics*, 2021 WL 2582967, at *2.

[277] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[278] *Enhabit, Inc. v. Nautic P'rs IX, L.P.*, 2024 WL 4929729, at *43 (Del. Ch. Dec. 2, 2024) (citing *Weinberger v. UOP, Inc.*, 517 A.2d 653, 654 (Del. Ch. 1986)).

[279] *Metro Storage*, 275 A.3d at 867 (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *3 (Del. Ch. May 11, 2001)); *see also William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011).

[280] *See HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 124 (Del. Ch. 1999) (explaining that feeshifting under the bad faith exception may be appropriate "if a prevailing party demonstrates that the losing defendants: i) engaged in bad faith conduct that increased the

The party invoking the bad faith exception bears the stringent evidentiary burden of producing clear evidence of bad-faith conduct by the opposing party. The standard is arduous: situations in which a party acted vexatiously, wantonly, or for oppressive reasons.[281]

"To justify an award under the bad faith exception, 'the Court must conclude that the party against whom the fee award is sought has acted in subjective bad faith.'"[282] "Ultimately, the bad faith exception is applied in extraordinary circumstances primarily to deter abusive litigation and protect the integrity of the judicial process."[283] "A lesser breach of fiduciary duty alone will not merit departing from the American Rule."[284] "Otherwise, every adjudicated breach of fiduciary duty would automatically result in a fee award."[285]

Defendants breached their fiduciary duties as agents by withholding a derivative award that belonged to their principal.[286] They continued to withhold the

---

costs of the litigation; or ii) engaged in pre-litigation conduct of a sufficiently egregious nature").

[281] *Marra v. Brandywine Sch. Dist.*, 2012 WL 4847083, at *4 (Del. Ch. Sept. 28, 2012) (quotations omitted).

[282] *K & G Concord, LLC v. Charcap, LLC*, 2018 WL 3199214, at *1 (Del. Ch. June 28, 2018) (quoting *Reagan v. Randell*, 2002 WL 1402233, at *3 (Del. Ch. June 21, 2002)).

[283] *Nichols v. Chrysler Gp., LLC*, 2010 WL 5549048, at * 3 (Del. Ch. Dec. 29, 2010).

[284] *Deputy v. Deputy*, 2020 WL 1018554, at *56 (Del. Ch. Mar. 2, 2020) (citing *HMG/Courtland Props.*, 749 A.2d at 124–25; *see also VGS, Inc. v. Castiel*, 2001 WL 1154430, at *2 (Del. Ch. Sept. 25, 2001) ("[M]erely being adjudicated a wrongdoer under our corporate law is not enough to justify fee shifting.").

[285] *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 706 (Del. Ch. 1996).

[286] *See* Summ. J. Op. at *16–23.

Award after Optimis took legal action to reclaim it, and even after I determined the Award "must be paid directly to Optimis."[287] They had no authority to do so, and that conduct was wrong. But I do not believe Defendants' subjective motivations, which were immaterial to my finding of liability on summary judgment,[288] reflect a "degree of scienter" that warrants feeshifting.[289]

Defendants credibly testified at trial that they did not know the depths of Optimis's financial distress during and after the Arbitration, and that they did not intend to harm Optimis.[290] They testified to their real, albeit mistaken, belief that there was a way to distribute the Award to Optimis stockholders "who have done nothing but simply invest money in the hope of a return."[291] That distribution was intended to exclude only Morelli and his confederates, whose actions gave rise to

---

[287] D.I. 48 at 3.

[288] Summ J. Op. at *23 (explaining that disputes about the "reasons why Defendants pursued this self-interested distribution" are "immaterial to the foundational conclusion that Defendants withheld the Award without authority to do so . . . in breach of their duty of loyalty").

[289] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2024 WL 4602914, at *7 (Del. Ch. Oct. 29, 2024) (emphasis omitted); *see also Ryan*, 709 A.2d at 706 ("The plaintiffs must carry the burden of persuading the Court that the defendants acted with *scienter* sufficient to warrant a finding of bad faith." (emphasis in original)).

[290] Atkins Tr. 342–44; Waite Tr. 277–78; Smith Tr. 391.

[291] Waite Tr. 323; *see also id.* ("We simply desired to have the proceeds from the derivative action, which was sort of a noneffort reward [for] OptimisCorp . . . go to the stockholders."); *id.* at 315 ("It was found money. I would assume they were trying to run the company effectively, and that . . . this was for the stockholders.").

the Derivative Action and in turn, the Arbitration.[292] Defendants viewed those individuals as unfaithful fiduciaries responsible for Optimis's pain, and likely to squander or siphon the money instead of investing it back into Optimis for its stockholders.[293] Indeed, that is what happened.[294]

Based on their testimony at trial, I do not find that Defendants subjectively believed they were "acting against the interests of [Optimis] stockholders" in a campaign "to advance their own interests solely."[295] I do not find Defendants acted egregiously or in bad faith.[296] With no circumstances warranting shifting fees, each party bears their own.

---

[292] JX 11.

[293] *See* Atkins Tr. 341 ("[T]he way I still see it is that [Sussman] and Morelli and the board were completely tied together because [the Derivative Action] was against all of them."); Smith Tr. 389; *see also* JX 11.

[294] $2,400,000 of the Award was immediately used to repay the Fulcrum loan. *See* Price Tr. 155. Another $1,641,000 was used to repay Morelli. *See* JX 470 at 16; Price Tr. 156. The balance was used to repay Marble Bridge, legal fees, and vendors. *See* Price Tr. 156–57.

[295] *Straight Path*, 2024 WL 4602914, at *8.

[296] *See id.* at *7–8 ("In other words, Jonas believed that he knew better than the Special Committee what was in the interests of both Straight Path *and* IDT; based on that belief, he bullied the Special Committee into giving up the Indemnification Claim, against its business judgment, and at a price set without any semblance of a fair process . . . . In other words, Jonas flagrantly breached his duties with respect to the indemnification asset. I do not find, however, that Jonas *believed he was acting against the interests of Straight Path stockholders* . . . . I find the exception to the American Rule unwarranted on that basis, therefore." (emphasis in original)).

As the prevailing party on the merits of this action, Optimis is entitled to have reasonable costs shifted in its favor under Court of Chancery Rule 54(d).[297]

## III.  CONCLUSION

For the foregoing reasons, Optimis is awarded $1.00 in nominal damages. Within 30 days, the parties shall submit a proposed stipulated order implementing this decision and, I believe, closing this case.

---

[297] Ct. Ch. R. 54(d).